CONNECTICUT BANKERS ASSOCIA-
TION and The Connecticut Bank and
Trust Company, Petitioners,

v.

The BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent,

Citicorp, Intervenor.

No. 79–1554.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 1979.

Decided Feb. 7, 1980.

Sharon S. Tisher, Hartford, Conn., with whom Howard W. Fogt, Jr., F. Anthony Maio and Catherine B. Klarfeld, Washington, D. C., were on brief, for petitioner.

Richard M. Ashton, Atty., Board of Governors of the Federal Reserve System, with whom Michael E. Bleier and Susan B. Weinberg, Atty., Board of Governors of the Federal Reserve System, Washington, D. C., was on brief, for respondent.

Arnold M. Lerman, Washington, D. C., with whom Michael L. Burack and Bruce Maximov, Washington, D. C., were on brief, for intervenor.

Barbara Allen Babcock, Asst. Atty. Gen. and Ronald R. Glancz, Atty., Dept. of Justice and James V. Mattingly, Jr., Atty., Board of Governors, Federal Reserve System, Washington, D. C., entered an appearance for respondent.

Before LEVENTHAL *, ROBB and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

For the second time [1] this court is called upon to examine the hearing requirement

---

\* Judge Leventhal authored this opinion but died before it was released.

1. *See Independent Bankers Ass'n of Georgia v. Board of Governors of the Federal Reserve System*, 170 U.S.App.D.C. 278, 516 F.2d 1206 (1975).

under Section 4(c)(8) of the Bank Holding Company Act of 1956,[2] as amended in 1970.

Petitioners challenge an order of the Board of Governors of the Federal Reserve System ("the Board") which, *inter alia*, denied their request for a formal evidentiary hearing on the application of a bank holding company to engage in limited nonbanking activities. On the major issues in the case, which were addressed by the Board, we find no error at this time in the Board's decision not to hold a formal hearing. On at least one of petitioners' contentions, however, the record before us does not reflect any Board inquiry, and we remand it for further consideration.

## I. BACKGROUND

Citicorp, a bank holding company headquartered in New York City, proposes that Person-to-Person Financial Center of Connecticut, Inc. ("Person-to-Person") establish an office in Westport, Connecticut, to engage in second mortgage lending and the sale of credit related insurance.[3] Person-to-Person will operate as a wholly-owned subsidiary of Nationwide Financial Services Corporation ("Nationwide") which in turn is wholly-owned by Citicorp. Citicorp is the second largest bank holding company in the nation. It has diverse controlling interests in domestic nonbanking institutions, such as Nationwide, as well as in two New York banks, including "Citibank" of New York City. Nationwide provides a wide range of consumer finance services through 179 offices in 29 states.

On September 26, 1978, following publication of its proposal in several Connecticut newspapers, Citicorp submitted the Person-to-Person application to the Federal Reserve Bank of New York. Timely objections to the application were filed by 12 protestants including the two petitioners in this case. In separate letters of October 12, 1978, opposition was registered by petitioner Connecticut Bankers Association (CBA), a trade association of 66 commercial banks doing business in Connecticut, and petitioner Connecticut Bank and Trust Company (CBTC), a large Connecticut bank.[4]

Petitioners raised two principal objections that are relevant to this appeal. First, they maintained that the structural, managerial, and operational interrelationship of Citicorp, Citibank, Nationwide, and Person-to-Person would constitute a unitary operation amounting to branch banking by Citibank in violation of state and federal statutes. Second, they argued that the adverse effects of the Citicorp proposal, including the undue concentration of economic resources, the diminution of competition, and the potential for unfair competition against Connecticut banks, outweighed the application's public benefits.[5] From the outset petitioners requested that the Board afford them a formal evidentiary hearing and prehearing discovery rights in order to examine factual matters pertinent to their objections.[6] Citi-

---

**2.** 12 U.S.C. § 1841 *et seq.* (1976). Section 4(c)(8) appears at 12 U.S.C. § 1843(c)(8).

**3.** Citicorp's application originally proposed to offer consumer and business lending as well. R.1. These intended activities were later withdrawn in order that the application conform to the scope of the license granted to Citicorp by the Connecticut Banking Commissioner. ("R." refers to the administrative record in this case. All citations to the record appear in the Joint Appendix.)

**4.** R.55–63. The other 10 protestants, Connecticut commercial banks and bank holdings companies, did not petition for review of the Board order.

**5.** Petitioners have not sought review of the Board's rejection of two further substantive objections to the Citicorp application. In one they alleged that the proposed activities of Person-to-Person would constitute "banking business" in violation of Connecticut law. A declaratory judgment action on that issue is presently pending in the Connecticut Superior Court. The other issue involved the applicability of various factors laid out in the Community Reinvestment Act, 12 U.S.C. § 2903 (Supp. I 1977). The Board found the Act inapplicable to an application by a bank holding company to engage in second mortgage lending and the sale of credit related insurance.

**6.** R.55, 56, 58, 61, 63.

corp responded to the comments of petitioners and other application protestants.

The Board [7] extensively investigated the Citicorp application over the period of eight months subsequent to its filing. Early in that inquiry, the Board requested petitioners to provide a statement summarizing the evidence they intended to submit and elicit at the requested hearing as well as a statement detailing specific issues of fact requiring an evidentiary hearing. CBA's response of November 21, 1978, refined somewhat its arguments on the branch banking and net public benefits issues. With respect to the former it listed ten specific areas dealing with the relationship between Citicorp and its subsidiaries which it believed warranted a hearing.[8] CBTC's response essentially incorporated the CBA submission by reference. Citicorp rejoined that the CBA letter was generally inadequate as a matter of law to require a formal hearing or to justify denying the Person-to-Person application.

Based on the written submissions and other information generated by its inquiry, the Board on February 7, 1979, asked Citicorp to provide "specific and detailed answers" to eight questions pertaining to the proposed relationship, if any, between Person-to-Person and Citibank.[9] On February 16, Citicorp gave answers to these questions.[10]

On March 16, 1979, the Board of Governors met to consider Citicorp's application and petitioners' request for a formal hear-

ing. It deferred final action on both matters, but gave petitioners an opportunity to make an informal presentation before members of the Board's staff "to develop a record and to clarify any issues of fact" relevant to the application.[11] That presentation took place on March 29. Subsequently, petitioners filed written arguments in support of their hearing request, and Citicorp responded by letter.

On May 25, 1979, the Board met again on the proposal. The Board approved Citicorp's application and denied petitioners' requests for a formal hearing.[12] It specifically rejected each of petitioners' substantive objections, and denied petitioners' request for an evidentiary hearing "because there are no facts in dispute that bear upon the determination the Board must make."[13] The Board conceded that a hearing is required when material issues of fact are in dispute, but found in this case that petitioners' unsupported conclusory allegations did not satisfy the requisite showing for invoking the hearing requirement.

On May 30, 1979 petitioners filed their petition to review the Board's order. Citicorp was permitted to intervene. This court ordered that the Board order be stayed [14] and expedited consideration of the appeal.

## II. ANALYSIS

The issue on appeal is narrowly framed. Petitioners do not directly contest the Board's findings on any of the substantive

7. The Board itself, rather than the Reserve Bank in New York, acted on the Citicorp proposal after it was contested.

8. R.145, 146–47.

9. R.305–306.

10. R.315–17.

11. R.350.

12. The full Board Order Approving Second-Mortgage Lending And Acting As Agent Or Broker In The Sale Of Credit-Related Insurance can be found at R.510–33.

13. R.529.

14. The stay took effect as of June 22, 1979, the day after Connecticut Senate Bill No. 1686 became effective as Public Act No. 79–563, 1979 Conn.Legis.Serv. 1649. That law imposed a moratorium on the opening of any bank holding company offices in Connecticut, pending completion of a report studying the desirability of limiting bank holding company expansion in the state. It has no retroactive application to the Citicorp application, which the Connecticut Banking Commissioner had previously approved (see note 35, infra).

matters addressed in its order. They argue that the Board erroneously deprived them of their statutory right to an evidentiary hearing.

### A. Statutory and Regulatory Framework

We begin by examining the framework within which the Board processes applications of bank holding companies to engage in nonbanking activities. The Bank Holding Company Act of 1956 restrains banks and bank holding companies from entering into unrelated business pursuits. Congress heeded the frequently voiced fear that banks could wield their economic power in such a way as to dominate other elements of the private sector.[15] It responded with a general prohibition forbidding bank holding companies from acquiring nonbanking enterprises.[16]

Congress recognized, however, that an absolute prohibition might not best serve the public interest. It took account of numerous services closely related to banking, such as performing trust activities or acting as a financial advisor, which holding companies could provide in an efficient, competitive fashion. Accordingly, Congress established several exceptions to the general prohibition. The most significant exception, found in Section 4(c)(8) of the Act,[17] permits bank holding companies to acquire

> shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. In determining whether a particular activity is a proper incident to banking or managing or controlling

banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices.

Congress broadly entrusted in the Board the responsibility for administering the Bank Holding Company Act. Among its delegated duties, the Board must grant permission for bank holding companies to enter related fields on a determination that the proposed activities are "so closely related to banking . . . as to be a proper incident thereto" and that the public benefits of such an activity by the bank holding company can reasonably be expected to outweigh possible adverse effects.

The Board has adopted a two-step procedure for reviewing Section 4(c)(8) applications. First, the Board determines as a general matter whether the type of activity is closely related and incidental to banking. Exercising its rulemaking authority, the Board issued Regulation Y, which at present lists 13 permissible banking-related activities, including the making of second mortgage loans and the sale of credit-related insurance.[18] Second, the Board decides whether the public benefits of the specific activity proposed in an application will outweigh potential adverse effects. This decision is made on a case-by-case basis after scrutiny of the particular application. Thus the Board could find in a given case, even though the proposed activity was properly found to be closely related to banking in general, that the particular application must be denied because it failed the "public

---

15. *See generally* H.R.Rep.No.609, 84th Cong., 1st Sess. (1955); S.Rep.No.1095, 84th Cong., 1st Sess. (1955), U.S.Code Cong. & Admin. News 1956, p. 2482.

16. *See* 12 U.S.C. § 1843(a) (1976).

17. 12 U.S.C. § 1843(c)(8) (1976).

18. 12 C.F.R. § 225.4(a)(1) and (9) (1979).

benefits" test.[19] This court [20] and others [21] have expressly endorsed the Board's two-step process. The issue here is whether the Board erred in making the "public benefits" determination, at the second stage, without an evidentiary hearing.

Section 4(c)(8) says only that an "opportunity for hearing" must be provided. The legislative history is somewhat more instructive. Prior to 1970, the Board was required to conduct a full evidentiary hearing on every application—whether contested or not—before it could be approved or denied. The Board could authorize an activity under Section 4(c)(8) only if it made the pertinent determinations "after due notice and hearing, and on the basis of the record made at such hearing." [22] To reduce the need to employ this costly and time-consuming procedure in every case, Congress in 1970 amended the above phrase to read, "after due notice and opportunity for hearing." The Committee reports stated that this change, recommended by the Board, was designed to reserve evidentiary hearings only for those cases "where parties other than the applicant are interested," [23] and "where a contest is raised." [24]

The legislative history cannot be read so literally as to mandate the holding of a formal hearing in every case in which an application is contested. Such an interpretation would compel the Board to conduct

hearings upon a mere request, a result which would undercut the deliberate legislative revision.[25] So we have held, and this much petitioners have conceded.

The critical question is under what circumstances must the Board utilize the formal hearing mechanism. Our 1975 opinion in *Independent Bankers Association of Georgia* [26] reversed a Board order denying application protestants an opportunity for a hearing to explore branch banking and public benefits issues. After examining the language, function, and legislative history of the Section 4(c)(8) hearing requirement, the court concluded that the Board is required to accord a full hearing to interested parties whenever there is a dispute as to facts material to the Board's ultimate decision.[27] The court found such a dispute in the record then before it and instructed the Board to conduct an appropriate hearing. Although it understood and implemented Congress's intent that a hearing be available to interested parties where a meaningful dispute exists, the court made clear that evidentiary hearings were not universally required:

> [A]n agency is not required to conduct an evidentiary hearing when it can serve absolutely no purpose. In such a circumstance, denial of a hearing may be proper even though adjudicatory proceedings are

**19.** Congress expressly contemplated this eventuality. *See* H.R.Rep.No.91–1747, 91st Cong., 2d Sess. 22 (1970) (conference report), U.S. Code Cong. & Admin.News 1970, p. 5519.

**20.** *See Investment Company Institute v. Board of Governors of the Federal Reserve System,* 179 U.S.App.D.C. 311, 314 n.2, 551 F.2d 1270, 1273 n.2 (1977); *Independent Bankers Ass'n of Georgia v. Board of Governors of the Federal Reserve System,* 170 U.S.App.D.C. 278, 287–88, 516 F.2d 1206, 1215–16 (1975).

**21.** *See, e. g., Florida Ass'n of Insurance Agents, Inc. v. Board of Governors of the Federal Reserve System,* 591 F.2d 334, 335 (5th Cir. 1979); *Citicorp v. Board of Governors of the Federal Reserve System,* 589 F.2d 1182, 1190 (2d Cir. 1979); *Association of Bank Travel Bureaus, Inc. v. Board of Governors of the Federal Reserve System,* 568 F.2d 549, 551–52 (7th Cir. 1978).

**22.** 12 U.S.C. § 1843(c)(6) (1956). In 1966 this subsection was renumbered § 1843(c)(8).

**23.** S.Rep.No.91–1084, 91st Cong., 2d Sess. 15 (1970), U.S.Code Cong. & Admin.News 1970, p. 5534.

**24.** H.R.Rep.No.91–1747, 91st Cong., 2d Sess. 15 (1970) (conference report).

**25.** *See Independent Bankers Ass'n of Georgia v. Board of Governors of the Federal Reserve System,* 170 U.S.App.D.C. 278, 299–300, 516 F.2d 1206, 1227–28 (1975) (Robb, J., concurring).

**26.** *Independent Bankers Ass'n of Georgia v. Board of Governors of the Federal Reserve System,* 170 U.S.App.D.C. 278, 516 F.2d 1206 (1975).

**27.** *Id.* 170 U.S.App.D.C. at 293, 516 F.2d at 1221.

provided for by statute. The agency, however, carries a heavy burden of justification. Where Congress has plainly given interested parties the right to a full hearing, the agency must show that the parties could gain nothing thereby, because they disputed none of the material facts upon which the agency's decision could rest.[28]

The Eighth Circuit, in the *American Bancorporation* decision,[29] reached similar conclusions. That court ruled that an evidentiary hearing was necessary with respect to a Section 4(c)(8) application in order to explore an applicant's inherent conflict of interest problem which could bear heavily on the "public benefits" determination. However, it noted;

> We do not suggest by this opinion that any list of unanswered factual issues will unlock the door to a trial-type hearing. Congress by the 1970 amendment to the Bank Holding Company Act intended to reduce the volume of formal hearings in a burgeoning field in an effort not to overtax the supervisory capabilities of the Board. Informal supervision has characterized regulation in the banking industry [citation omitted], and should be encouraged.[30]

 From these cases we distill the following: The Board cannot lightly dismiss a protestant's request for an evidentiary hearing. Where a contest exists with respect to a material fact, the Board must conduct a full evidentiary hearing on that issue. Moreover, the burden of making the requisite showing to trigger the hearing requirement is not great. As stated in *Independent Bankers:*

> A petitioner need not make detailed factual allegations in order to meet the requirement that he raise "issues of material fact." [31]

Nonetheless, a protestant does not become entitled to an evidentiary hearing merely on request, or on a bald or conclusory allegation that such a dispute exists. The protestant must make a minimal showing that material facts are in dispute, thereby demonstrating that "an 'inquiry in depth' is appropriate." [32]

Were the Board to indiscriminately grant requests for hearings, procompetitive growth in banking-related fields would be inhibited. Evidentiary hearings consume time, energy, and resources of the Board and parties alike, apart from the possibility of undue intrusion on and harassment of applicants. The Board is not to be burdened with a hearing requirement where a protestant has not given reason to believe a hearing would be worthwhile.

### B. The Need for a Hearing on the Citicorp Application

The Board concedes that formal hearings must be provided where disputed facts indicate that a substantial factual inquiry would be fruitful. However, it views the case before us as "one of those exceptional instances where the expensive and time-consuming procedure of a formal hearing would be futile." [33] It is the Board's position that all material facts in the Citicorp application are undisputed, and that petitioners' allegations are either immaterial, or are conclusory, involving only arguments or commentary on the significance of the evidentiary facts.

We turn to the two principal objections to the Citicorp application, to ascertain whether there are material facts in dispute that trigger the hearing requirement.

### Branch banking

Petitioners seek an evidentiary hearing to examine whether Person-to-Person would

---

28. *Id.* 170 U.S.App.D.C. at 292, 516 F.2d at 1220.

29. *American Bancorporation, Inc. v. Board of Governors of the Federal Reserve System,* 509 F.2d 29 (8th Cir. 1974).

30. *Id.* at 39.

31. 170 U.S.App.D.C. at 292 n.57, 516 F.2d at 1220 n.57.

32. *Id.*

33. Govt. Br. at 26.

constitute a *de facto* branch bank of Citibank in violation of state and federal statutes. The National Bank[34] Act and Connecticut legislation[35] combine to prohibit a national bank based outside of Connecticut from operating a branch office in that state. Since a branch is defined to include an office which lends money,[36] if Person-to-Person were to operate as a Citibank branch, the Board would be required to deny Citicorp's application.

We are convinced that the Board acted properly with respect to the branch banking issue. Put simply, petitioners made no showing in support of their allegations that Citicorp, Citibank, Nationwide, and Person-to-Person would constitute a "unitary operation" amounting to illegal branch banking. The Board found in its May 25 order that petitioners "have not submitted any evidence that Person-to-Person, directly or indirectly, or through any device, will act for, on behalf of, or be controlled by Citibank."[37] What petitioners ask in essence is a discovery expedition without a chart and without giving the Board any reason to believe the open-ended voyage would reach the Indies. There is not a scrap of evidence—as contrasted with mere possibility or speculation—which would be indicative of unlawful branch banking to Citibank.

■ When Congress enacted the Bank Holding Company Act it contemplated and authorized the operation of certain nonbanking subsidiaries by bank holding companies. This furthered the public interest in efficiency and competition, when not offset by disadvantages. While fully recognizing that bank holding companies would be permitted to engage in activities that were precluded to a bank, Congress sanctioned bank holding company entry into geographical areas where the company's subsidiary banks were excluded by a stringent branch banking laws.[38] The ultimate control of a parent bank holding company is not enough to have a nonbank subsidiary constitute a "branch" of a bank subsidiary. Petitioners do not gainsay this. Indeed petitioner CBTC,[39] and doubtless other members of CBA, is owned by a parent bank holding company that also owns subsidiaries authorized to perform various other nonbanking activities.

Petitioners have not put forth any evidence, beyond the bare fact of common ownership, that Person-to-Person would in fact operate as a branch of Citicorp's bank subsidiary. To dispose of the branch banking issue, the Board relied in part on Citicorp's written assurances concerning the proposed relationship between Person-to-Person and Citibank. The Board's opinion states:

> Applicant has assured the Board that all of Person-to-Person's activities would be engaged in on behalf of Person-to-Person. Applicant has stated that there will be no interlocking officers, directors or management personnel between Citibank and Person-to-Person; that Person-to-Person would not be funded by Citibank; that Person-to-Person would not serve as a loan production office of Citibank; and that Person-to-Person would not perform any services for customers of Citibank,

---

**34.** 12 U.S.C. § 36 (1976).

**35.** Conn.Gen.Stat.Ann. §§ 36–5a, 36–59(4) (West). The Connecticut Banking Commissioner, on December 8, 1978, approved the Person-to-Person proposal, since it could not find that the office would enable Citicorp to engage in banking business in Connecticut in contravention of Conn.Gen.Stat.Ann. § 36–5a(b) (West Supp.1979). R.179–80.

**36.** A branch is defined to include any place where a national bank does business and at which "deposits are received, or checks paid, or *money lent.*" 12 U.S.C. § 36(f) (1976) (emphasis added). *See also First National Bank in*

*Plant City v. Dickinson*, 396 U.S. 122, 133–35, 90 S.Ct. 337, 343–44, 24 L.Ed.2d 312 (1969).

**37.** R.516.

**38.** *See Grandview Bank & Trust Co. v. Board of Governors of the Federal Reserve System*, 550 F.2d 415, 419–20 (8th Cir.), *cert. denied*, 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977). *See also* H.R.Rep.No.609, 84th Cong., 1st Sess. 3–4, 14–16 (1955); S.Rep.No.1095, 84th Cong., 1st Sess. 10–11 (1955), U.S.Code Cong. & Admin. News 1956, p. 2482; R.518.

**39.** *See* Int. Br. at 6.

nor solicit or make any loans or take any deposits on behalf of Citibank. Applicant has also assured the Board that Citibank would not participate in, or purchase any loans from, Person-to-Person.[40]

Petitioners rightly point out that an applicant's assurances, even when offered in good faith, cannot alone eliminate the need for an evidentiary hearing. In *Independent Bankers* we chided the Board for treating an applicant's "skeletal representations as to their intended operation as determinative of its legality."[41] The Board's treatment of the Citicorp application, however, differs from its actions in the *Independent Bankers* case. The Board did not treat Citicorp's assurances as determinative but in addition relied on Citicorp's long and unmarred history of lawful parent-subsidiary relationships, including Person-to-Person operations in other states, within a traditional bank holding company structure. Based on Citicorp's extensive record of performance, the Board saw no need to invoke the formal hearing mechanism to further scrutinize Citicorp's description of its proposed operation.

The record is devoid of facts which contradict the applicant's assurances and stands in sharp contrast to the situation in *Independent Bankers*, where protestants cited numerous facts evidencing the applicant's "alleged proclivity . . . shown in the past for using puppet corporations to avoid branching laws."[42] That bank holding company sought to transfer the mortgage activity and related management personnel from its bank (one of the dominant banks in Georgia) to a new subsidiary in the same state. This court concluded that "in view of the [holding company] system's allegedly questionable record of expansion,"[43] a hearing was necessary in order to test the substance and motives of the company's representations.

On the branch banking issue, the Citicorp application contains nothing remotely resembling the factors found sufficient in *Independent Bankers* to trigger the hearing requirement. Applicant's representations as to intentions are supported by applicant's past conduct, and petitioners have not provided the Board with any evidence based on past conduct or otherwise, to challenge them. Nor have petitioners demonstrated that there is reason to believe a hearing would prove these representations to be inaccurate.

Petitioners did offer two incidents on a claim that they raise a "serious question as to whether Citicorp or its subsidiaries had transgressed the bounds of permissible activity under applicable banking and bank holding company law."[44] Neither incident should require the Board to conduct a hearing. One involved the then-pending investigation of a revolving line-of-credit program provided by the Person-to-Person Company in Oregon. That inquiry was resolved in Citicorp's favor.[45] It dealt with a service not to be offered in the Connecticut office. It is not relevant to the branch banking issue.

The other incident concerned a pending complaint against Citibank for offering investment advice to an independently sponsored mutual fund. This practice may well be upheld ultimately as permissible, but in any event is irrelevant to the question of branch banking.[46]

---

40. R.516.

41. 170 U.S.App.D.C. at 296, 516 F.2d at 1224. *See also American Bancorporation, Inc. v. Board of Governors of the Federal Reserve System*, 509 F.2d 29, 38 (8th Cir. 1974).

42. 170 U.S.App.D.C. at 296, 516 F.2d at 1224.

43. *Id.*

44. Pet. Br. at 6.

45. *See* Letter from James A. Redden, Oregon Attorney General to John B. Olin, Superintendent of Banks (January 4, 1979).

46. The Board's regulations expressly permit bank holding companies to act as investment advisors to mutual funds, as long as they do not participate in organizing, managing, controlling or sponsoring these funds. *See* 12 C.F.R. § 225.125 (1979).

Petitioners also objected to the Board's failure to investigate Citicorp's proposed promotional efforts. They reason that close identifi-

The combination of Citicorp's assurances, its substantial history of lawful Section 4(c)(8) operations within the traditional bank holding company structure, and the absence of evidence either disputing its representations or indicating that a hearing would be productive, lead us to conclude that the Board had ample basis for its ruling that Citicorp's proposal would not violate federal or state branch restrictions, and that there were no material issues of fact that would entitle petitioners to a formal hearing.

### C. Undue Concentration and Anticompetitive Effects

Before approving a particular application under Section 4(c)(8) the Board must determine that the public benefits of the proposed activity are reasonably likely to outweigh its possible adverse effects. The Board concluded in its May 25 order that Citicorp's proposed establishment *de novo* of a single office to engage in limited activities could be expected to have positive competitive effects, particularly in light of the absence of any evidence to the contrary.[47] Petitioners find error in the Board's failure to conduct a hearing to explore three adverse effects enumerated in the statute: the undue concentration of resources, decreased competition, and unfair competitive practices.

### Preliminary observations on the net benefits inquiry

■ Several preliminary observations are in order. In making its net public benefits determination, the Board's reasoned judgments are entitled to some deference in view of its considerable expertise and experience in administering the Bank Holding Company Act.[48] In addition, although the Board's inquiry must proceed with rigor, we cannot require it to investigate every potential adverse contingency which a contestant hypothesizes.[49] Section 4(c)(8) directs the Board to determine whether the proposed activity "can *reasonably be expected* to produce benefits . . . that outweigh possible adverse effects." (Emphasis added.)

Implicit in Regulation Y is the Board's reasoned determination that the permissible activities, including second mortgage lending and the sale of credit-related insurance, can generally be expected to achieve net public benefits.[50] A specific proposal to engage in otherwise permissible conduct may provide negative results. But a protestant has some burden, albeit minimal, to show that the Board's general determination is not applicable.

### De Novo Activity

Further, in this case the Board relied on the fact that the specific application was a new activity for applicant—a *de novo* operation. Congress has provided in Section 4(c)(8), that:

> In orders and regulations under this subsection, the Board may differentiate between activities commenced de novo and activities commenced by the acquisition, in whole or in part, of a going concern.[51]

The legislative history confirms the Board's reading of Congress' intent when inserting that language in 1970, that:

> where a bank holding company enters a new market *de novo*, or through acquisition of a small firm, as opposed to acqui-

---

cation between Person-to-Person and Citibank would further demonstrate the existence of an unlawful "unitary operation." Although Citicorp's advertising plans may be relevant to other questions committed to the Board for scrutiny, we see no error in the Board's position that the manner in which Person-to-Person would be advertised is not material to the branching issue. The core of the branch banking issue is a system's operational interrelationships, rather than its public image. Petitioners have given the Board no reason to suspect that Citicorp's advertising will link Person-to-Person and Citi*bank*.

47. R.522, 531–33.

48. *See Alabama Ass'n of Insur. Agents v. Board of Governors of the Federal Reserve System*, 533 F.2d 224, 246 (5th Cir. 1976), cert. denied, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).

49. *Id.*

50. R.522.

51. 12 U.S.C. § 1843(c)(8) (1976).

sition of a substantial competitor, its desire to succeed in its new endeavor is more likely to be competitive. This legislation specifically emphasizes the importance of the manner in which a bank holding company may enter new activities. Such considerations will be particularly important in the context of expansion by bank holding companies into new geographic markets.[52]

With its general finding in the regulations, and the specific situation of a *de novo* activity, the question is whether petitioners have made a showing of possible adverse effects sufficient to invoke the formal hearing mechanism.

*Undue concentration of resources*

On the issue of undue concentration of resources, petitioners produced some evidence as to the size of Citicorp, the "proliferation" of its lending subsidiaries, and the precarious, competitive position of the Connecticut banking industry. Beyond these undisputed facts it offered no reason to believe a hearing would uncover any other material evidence that the Citicorp application as proposed would lead to an undue concentration of resources. As the Board observed, the essence of petitioners' theory is more generally that Citicorp's lending operations "at some time in the future" may result in this undue concentration.[53] The Board dismissed this speculative and unsupported argument as an inappropriate subject for scrutiny at this time. It further concluded that such a finding as to Citicorp's concentration might become appropriate in the future, but it was unable to find that material to the limited Person-to-Person application before it which could

hardly result in an undue concentration of resources in the Connecticut market. The Board noted that Citicorp would have to apply anew before opening any additional office.

■ Petitioners call our attention[54] to a recent article by a Board economist which emphasizes that in the area of nonbank activities performed by bank holding companies, "conditions for increasing concentration are emerging," and that it is "essential that the question of aggregate concentration be raised."[55] Closer scrutiny of the piece reveals that it does not yet detect "any meaningful increase in aggregate concentration." At most it highlights the fact that the problem, if it exists at all, must be broadly addressed as a policy matter implicating the basic legislative and regulatory scheme now in effect. The Board did not err when it failed to hold an adjudicatory hearing, on a single Section 4(c)(8) application, in order to raise and resolve this broad, complex, and far-reaching concern.

Before leaving the issue of undue concentration, we reiterate that protestant's showing as to Citicorp is far different from that made in *Independent Bankers*.[56]

*Decrease in competition to detriment of Connecticut banks*

Petitioners maintain that the Citicorp application will decrease competition to the detriment of Connecticut banks. They introduced evidence to show that the Connecticut banking industry is highly competitive and that Connecticut commercial banks are "particularly vulnerable competitive-

---

52. H.R.Rep.No.91–1747, 91st Cong., 2d Sess. 17–18 (1970) (conference report), U.S.Code Cong. & Admin.News 1970, p. 5568. *See also* S.Rep.No.91–1084, 91st Cong., 2d Sess. 16 (1970) ("[A]n activity commenced de novo will tend to have pro-competitive effects, and consequently should be viewed more favorably.") Accordingly, the Board has adopted different sets of procedures for processing applications for *de novo* entry and entry by acquisition. *Compare* 12 C.F.R. § 225.4(b)(1) *with* 12 C.F.R. § 225.4(b)(2) (1979).

53. R.523.

54. Pet. Br. at 23–24.

55. Rhoades, *Aggregate Concentration: An Emerging Issue in Bank Merger Policy*, 24 The Antitrust Bull. 1, 11–12 (Spring 1979).

56. The applicant's intended operation in the *Independent Bankers* case was to take place in the *same* state where the bank already dominated the state's financial world, and had done so in the past through *sub rosa* banking tactics. 170 U.S.App.D.C. at 298, 516 F.2d at 1226.

ly." [57] None of this evidence is disputed—by either the applicant or the Board. What protestants do not suggest is how the new Person-to-Person office—which will not engage in the business of banking—would decrease competition in the banking industry.

In this case, the relevant product market, as the Board brought out, is second mortgage lending and not commercial banking. Commercial banks are only part of the diverse group of financial institutions which make second mortgage loans.[58] Moreover, this activity does not appear to comprise a major portion of the business of commercial banks. CBTC's own data indicate that its second mortgage portfolio represents only $10 million of its over $2.5 billion in assets.[59]

We may assume, as a realistic matter and at least for present purposes, that the new Westport office will have an impact on petitioners—by reducing their share of the second mortgage market, to the extent Person-to-Person is successful, and conceivably by reducing second mortgage interest rates in the state. The possibility of that kind of impact was already known to the Board and did not require an evidentiary hearing. It does not undercut the Board's conclusion of net public benefit, for that kind of impact is only the obverse of the coin of competition. It only means more competition in second mortgage banking, a business that in general is without restrictions on competition other than those posed by general antitrust or unfair competition law. Petitioners have presented no evidence suggesting that Person-to-Person's very limited activities could substantially injure either Connecticut banks or nonbanking institutions in the second mortgage business.

■ Congress had no desire to freeze the *status quo* in non-banking operations. The legislative history on the issue of decreased competition makes clear that Congress was primarily concerned with the anticompetitive consequences of entry through acquisition of a going concern.[60] Thus in balancing petitioners' conclusory allegations and minimally relevant data against the pro-competitive presumption made by Congress as to *de novo* entry, the Board was fully warranted in concluding that the Citicorp proposal "shall have a salutary effect on competition." [61] And the Board made no mistake in finding no evidentiary hearing needed on that issue, for petitioners offered no dispute as to material facts, and no meaningful prospect that a hearing could reveal additional meaningful facts.

*Potential of unfair competitive practices*

Petitioners contend that the Board deprived them of a formal hearing on the issue of Citicorp's potential unfair competitive practices. This complaint, as a general matter, brings to the fore the possibility that Citicorp, by its conduct, would wield its position in such a way as to compete unfairly with Connecticut banking and bank-related institutions. In fact, it was this concern for the misuse of bank holding company economic power that in part prompted Congress to insert the "net public benefits" requirement in 1970. Though we make it clear that we are not reaching the merits of this issue, it might be argued that Citicorp could thwart the legislative will by making excessive use of the Citicorp or Citibank name in its promotional efforts on behalf of Person-to-Person. There is also the possibility that adverse competitive effects would accrue from "voluntary tie-ins" between Citibank and Person-to-Person. Voluntary tie-ins would occur if a prospective borrower perceives and acts on the belief that being a Citibank customer will be helpful or necessary in obtaining a loan (or more favorable terms on a loan) from Person-to-Person. The potential for voluntary tie-ins may be great where a large bank

---

**57.** Pet. Br. at 25.

**58.** Second mortgage loans can also be obtained from credit unions, industrial banks, savings and loan associations, and nondepository mortgage institutions.

**59.** Pet. Br. at 21 n.*.

**60.** *See* H.R.Rep.No.91–1747, 91st Cong., 2d Sess. 17–18 (1970) (conference report).

**61.** R.525.

with high name recognition is in close geographical proximity to the nonbank subsidiary and promotional activities in some significant way link the two entities. Were the Board to find excessive exploitation of the Citicorp or Citibank name, it could consider it as one adverse effect in making its net public benefits determination.

We cannot say at this time that the Citicorp application would or would not involve unfair competition. But the record does not disclose that the Board had sufficient basis on which to make such a determination. Its order suggests virtual indifference as to the unfair competition problem. The Board simply stated:

> The fact that an organization the size of Applicant is involved is insufficient to establish that such an organization would engage in unfair competition. Furthermore, there is no evidence that Applicant has engaged in unfair competitive practices in operating its other nonbanking subsidiaries that engage in the same or similar activities as would Person-to-Person.[62]

With this brief statement the Board ignores the uniqueness of this application, since the new *Citicorp* Person-to-Person office would be located in a "bedroom community" of New York City, the home of Citicorp and Citibank.

As with the branch banking issue, the voluntary tie-in and unfair competition problems deal with the applicant's proposed behavior, rather than the effects of its conduct. Yet in contrast to the Board's investigation of the branch banking matter, the Board made no attempt to question the applicant—or seek assurances—with respect to its proposed promotional efforts.[63] The record does not even identify an inquiry into Citicorp's advertising methods in other states. The availability of Citicorp to answer further questions and provide the record of past activities in other states undercuts any excuse that the Board cannot adequately review a prospective operation. Congress clearly expected more of the Board:

> [T]he dangers of "voluntary" tie-ins and reciprocity are basically structural and must be dealt with by the Board in determining the competitive effects of bank holding company expansion into fields closely related to banking when considering applications under Section 4(c)(8). These will be difficult questions, for assurances of good faith and the intention not to engage in tie-ins and reciprocity by the applicant bank holding companies will largely be irrelevant to the just as serious dangers of "voluntary" tie-ins and reciprocity. The Board must, in any case, consider these problems in carrying out its responsibilities under the Act.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Unfair competition . . . is an important factor for the Board to consider in its broadest context, especially in light of the testimony concerning the potential for unfair competition to be carried on by bank holding companies against small independent businesses.[64]

We remand the record in order that the Board may enlighten us as to the basis for concluding that there is no material issue of fact on this issue. We do not vacate the Board's order. The point we identify was not sharply enough focused before the Board to alert the Board to the need to elaborate its thinking. And it may be that the Board will be able, on further inquiry without a hearing, to substantiate that no formal hearing is required, and hence our limited remand does not instruct the Board to conduct an evidentiary hearing. The Board is directed to explore the manner in which Person-to-Person will be promoted and represented to the public, and to determine what effect, if any, these findings will have on the question of unfair competition generally, and voluntary tie-ins in particular, and ultimately, the net public benefits

---

**62.** R.526.

**63.** The Board conceded as much in its brief at 37 n.45.

**64.** H.R.Rep.No.91–1747, 91st Cong., 2d Sess. 18–19 (1970) (conference report), U.S.Code Cong. & Admin.News 1970, p. 5569.

determination.[65] The need for an evidentiary hearing will depend on what it uncovers in its further ·investigation.

Whether or not a hearing is ultimately provided, we note in closing that both the applicant and the petitioners will be free on remand to propose conditions for approval of the application which are relevant to the matters now open for further Board action.[66] The Board's counsel submit that even when conditions do not appear in the certificate of approval the applicant is bound by representations made in the application as well as by later assurances made in its support. Failure to observe these conditions subsequent to approval can result in the modification or divestiture of the authorized operation,[67] in addition to the imposition of civil penalties.[68]

We do not gainsay these observations as to the law, as the Board did not find that these future legal remedies mooted the issue. The Board has the responsibility to take action now to avoid future harm. And as of the present there are no representations addressed to the specific issue of unfair competitive practices.

For the foregoing reasons we remand the record for further actions not inconsistent with this opinion.[69]

*So ordered.*

---

**65.** The Board is free, of course, in its discretion, to reconsider any other issues pertinent to the application.

**66.** Petitioners suggest, for example, in their reply brief at 12, that the Board could direct "a modification of the content of the advertising campaign," or place disclaimers in the loan documents.

**67.** R.533. *See* 12 U.S.C. §§ 1818(b)(1), (3) (1976) and 12 C.F.R. § 255.4(c)(2) (1979). The

Connecticut Banking Commissioner is also required, under Conn.Gen.Stat.Ann. § 36–5a(b) (West), to suspend or revoke the license of an operation that does not comply with representations made in its application.

**68.** 12 U.S.C. § 1847 (1976).

**69.** In view of our disposition of this case, we see no need to continue the stay ordered June 14, 1979, and it is vacated.