**AMERICAN LAND TITLE ASSOCIATION,**
Petitioner,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM,**
Respondent,

**Firstar Corporation, Intervenor.**

No. 88–1872.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1989.

Decided Dec. 29, 1989.

Sheldon E. Hochberg, with whom William T. Finley, Jr., and David F.B. Smith, Washington, D.C., were on the brief, for petitioner.

Jacob M. Lewis, Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondent. Richard M. Ashton and James A. Michaels, Attys., Bd. of Governors of the Federal Reserve System, Washington, D.C., entered appearances for respondent.

John J. Gill and Michael F. Crotty, Washington, D.C., for American Bankers Ass'n, James T. McIntyre, Jr., and John W. Hunter, Washington, D.C., for Ins./Financial Affiliates of America, Inc., and Richard Whiting, Washington, D.C., for Ass'n of Bank Holding Companies, were on the brief for amici curiae urging the Court to affirm the order of the Bd. of Governors of the Federal Reserve System.

John D. Hawke, Jr., Howard N. Cayne, Leigh McGuigan and Pauline B. Heller, Washington, D.C., were on the brief for intervenor.

Before WILLIAMS and SENTELLE, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

American Land Title Association ("ALTA") petitions this Court for review of a decision of the Board of Governors of the Federal Reserve System ("the Board") to authorize First Wisconsin Corporation ("First Wisconsin")[1] to acquire all· of the outstanding shares of Milwaukee Title Insurance Service, Inc. ("Milwaukee Title"), a Milwaukee title insurance agency. Petitioners argue that the Bank Holding Company Act of 1956, as amended, 12 U.S.C. §§ 1841–1850 ("the BHCA" or "the Act"), prohibits banks from engaging in title insurance activities. Further, they claim that the Board's public benefits evaluation with respect to this particular acquisition was arbitrary and capricious.

We find that the Board's interpretation of the BHCA is adequately supported by the statute, and thus defer to the Board's conclusion that certain banks covered by a grandfather provision in the statute may be allowed to engage in title insurance activities. Further, we find the Board's public benefits analysis to be adequately supported. We therefore deny ALTA's petition.

## I. BACKGROUND

The BHCA prohibits bank holding companies from engaging in most nonbanking activities. 12 U.S.C. § 1843(a). The Act sets up certain exemptions from the general rule, including one which provides that a bank holding company is not prohibited by the statute from acquiring "shares of any company the activities of which the Board ... has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto...." *Id.* § 1843(c)(8). In determining whether a particular activity is a proper incident to banking, the Board must balance the public benefits stemming from the affiliation against the possible adverse effects. *Id.*

In 1982, Congress passed Title VI of the Garn–St. Germain Depository Institutions Act (the "Garn Act"), which, *inter alia,* amended § 1843(c)(8) to prohibit bank holding companies from engaging in insurance activities. The amendment states that "it is not closely related to banking or managing or controlling banks for a bank holding company to provide insurance as a principal, agent, or broker...." 12 U.S.C. § 1843(c)(8). The amendment contains a set of specific exemptions from the prohibition on insurance activities, including Exemption G ("the grandfather provision"). Exemption G provides an exception to the general prohibition against bank holding companies engaging in insurance activities "where the activity is performed, or shares of the company involved are owned, directly or indirectly, by a bank holding company ... which, prior to January 1, 1971, was engaged, directly or indirectly, in insurance agency activities as a consequence of approval by the Board prior to January 1, 1971." *Id.* § 1843(c)(8)(G). The scope of this grandfather provision is at issue in this case.

First Wisconsin did engage in Board-approved insurance activities prior to January 1, 1971. First Wisconsin did not, however, engage in title insurance activities prior to that time. In fact, it appears that as of January 1, 1971, the Board had not specifically authorized *any* bank holding companies to engage in title insurance activities. In 1985, the Board authorized First Wisconsin to engage in all types of personal and commercial insurance. *First Wisconsin Corp.,* 71 Fed.Res.Bull. 171 (1985). Although many particular types of insurance were specifically described in First Wisconsin's application and in the order, no mention of title insurance in particular was made during the 1985 proceedings.

On May 26, 1988, First Wisconsin applied for Board authorization of its acquisition of all of the outstanding stock of Milwaukee Title. The Board approved First Wisconsin's application in *First Wisconsin Corp.,* 75 Fed.Res.Bull. 31 (1989).

**1.** First Wisconsin changed its name to Firstar Corporation on January 1, 1989. We refer to the corporation as First Wisconsin.

ALTA challenges the Board's decision to authorize the acquisition arguing that title insurance activities are not covered by the grandfather provision embodied in Exemption G, and that this particular acquisition would not produce benefits to the public which would outweigh its likely adverse effects.

## II. The Scope of Exemption G

■ ALTA argues that Exemption G does not just grandfather certain bank holding *companies*, but that it also grandfathers certain insurance *activities*. ALTA does not go so far as to say that a grandfathered bank holding company may engage in only those particular insurance activities in which it engaged prior to 1971; such a construction of the exemption is foreclosed by agency precedent and this Court's recent statement that "neither Exemption G nor section 4(a)(2) contain any limitations on expansion into new geographic markets or into different lines of insurance...." *National Ass'n of Casualty and Surety Agents v. Board of Governors*, 856 F.2d 282, 285 (D.C.Cir.1988), *cert. denied*, ––– U.S. –––, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989). Rather, ALTA argues that the statute grandfathers only those insurance activities which were approved for *any* bank holding company prior to 1971.

ALTA relies on the explanation of the committee which drafted Exemption G to support its view that Exemption G grandfathers not just certain companies, but also certain activities. The Conference Report states:

> The House receded with an amendment to grandfather the insurance activities of a bank holding company registered with the Federal Reserve Board which, prior to January 1, 1971, was engaged, directly or indirectly, in insurance agency activities as a consequence of approval by the Board prior to January 1, 1971.

S.Conf.Rep. No. 641, 97th Cong., 2d Sess. 91 (1982) ("Conference Report"), *reprinted in* 1982 U.S.Code Cong. & Admin.News 3054, 3128, 3134. Further, ALTA points to the Board's own determination that Exemp-

tion G does not allow the Board to authorize grandfathered bank holding companies to engage in insurance underwriting activities. The Board explained that the provision was intended "to permit bank holding companies to engage in only the general kinds of activities the Board permitted prior to 1971." Bank Holding Companies and Change in Bank Control; Permissible Insurance Activities for Bank Holding Companies, 51 Fed.Reg. 36201, 36210–11 (1986).

The Board rejected ALTA's argument, noting that the language of the statute "does not limit or restrict the scope of permissible insurance agency activities for qualifying bank holding companies to those insurance agency activities approved by the Board prior to 1971." 75 Fed.Res.Bull. at 32. The Board also emphasized that it had previously held that the Exemption grandfathers any general insurance agency activity, not just those in which a particular applicant for an exemption engaged prior to 1971. *Id.* Finally, the Board concluded that "[t]itle insurance is 'insurance' within the commonly understood meaning of the term" and thus falls within the literal authorization of Exemption G and the Board's implementing regulation. *Id.*

Our task is to enforce the unambiguously expressed intent of Congress. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the statute is ambiguous, we must defer to the Board's construction of the statute as long as it is reasonable. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–82.

The language of Exemption G does not clearly limit the types of activities which are grandfathered. Rather, the exemption by its terms appears to permit certain *companies* to engage in insurance agency activities. If title insurance activities are among those *prohibited* by 12 U.S.C. § 1843(c)(8), then they are presumedly among those *permitted* by the grandfather exemption to this section. 12 U.S.C. § 1843(c)(8)(G).

Nor does the legislative history invoked by ALTA clearly provide that only certain insurance agency activities may be grand-

fathered.[2] The statement that the amendment grandfathers "the insurance agency activities of a bank holding company ... which, prior to January 1, 1971, was engaged ... in insurance agency activities ...," Conference Report at 91, might arguably be taken to mean that only the particular pre–1971 insurance agency activities of a given qualified company are grandfathered by Exemption G. As we have seen, this argument is foreclosed by this Court's previous recognition that Exemption G is not that narrow. *National Ass'n of Casualty and Surety Agents*, 856 F.2d at 286. Once this reading of the legislative history is rejected, there is nothing in the conference committee's statement which supports the conclusion that only those activities which were approved generally by the Board prior to 1971 are grandfathered by the Exemption. The provision merely grandfathers "the insurance agency activities" of certain companies. Even by the terms of the legislative history cited by ALTA, the only significance of the 1971 cutoff is that it establishes which *companies*, not which *activities*, are grandfathered.

Finally, the apparent purposes of the statute do not support ALTA's interpretation of Exemption G. Nothing in the statutory language or legislative history suggests, as ALTA would have us believe, that the grandfather provision was intended to limit the insurance activities in which grandfathered companies can engage to precisely the kinds of insurance activity authorized in 1971. Regardless, ALTA is not necessarily correct in asserting that the Board's decision in fact does enlarge the permissible scope of insurance activities in which grandfathered companies can engage. Even prior to 1971, certain companies were authorized to engage in general insurance agency activities. The Board has concluded that title insurance is a general insurance agency activity. Whether or not any bank holding companies actually engaged in title insurance activities prior to 1971, some may well have been authorized to do so.

Nothing, then, in the language, history, or purpose of the BHCA and Exemption G supports the interpretation that ALTA proffers. If anything, the plain language of the statute and its history and purposes support the Board's construction. Even if we were to find the statute to be ambiguous with respect to whether title insurance agency activities are grandfathered under Exemption G, this Court must defer to the agency's construction of the statute as long as it is reasonable. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–82. We conclude that it is.

As we have already observed, the Board's construction jibes with the language of the Garn Act and its Exemption G and is not inconsistent with the legislative history cited by ALTA. Moreover, the Board's interpretation is buttressed by a number of prior Board decisions that the Exemption grandfathers insurance agency activities in general. The Board's regulation implementing Exemption G states that grandfathered companies may be authorized to engage in "any insurance agency activity." 12 C.F.R. § 225.25(b)(8)(vii) (1988). In its explanation of this regulation the Board notes that the exemption permits qualified bank holding companies "to engage in general insurance agency activities without restriction as to location or to type of insurance sold." 51 Fed.Reg. at 36,210.[3] The Board has consistently followed such

2. We do not mean to imply that the legislative history discussed here would be dispositive even if it did support ALTA's position. This Court has noted in the past that "[w]hile a committee report may ordinarily be used to interpret unclear language contained in a statute, a committee report cannot serve as an *independent statutory source having the force of law*." *International Bhd. of Elec. Workers v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987) (emphasis in original) (citations omitted). The particular piece of legislative history cited here may be particularly suspect because it was circulated to members of Congress only after the Senate vote on the bill and on the day of the House vote.

3. The Board thus concluded that underwriting was not a permissible activity for grandfathered bank holding companies not because underwriting activities were not authorized prior to 1971 but because underwriting is not an insurance *agency* activity of the sort grandfathered by the Exemption. 51 Fed.Reg. at 36,210–11.

an interpretation of the statute in authorizing qualifying bank holding companies to engage in insurance activities other than those in which they engaged prior to 1971.[4]

In the present case, the Board has reasonably concluded that title insurance is an insurance agency activity. Title insurance may be distinct from other insurance agency activities in some respects; however, ALTA does not dispute that title insurance is, nonetheless, insurance. Indeed, if it were not, the prohibition of section 1843, on which ALTA necessarily relies, would be completely inapplicable. Title insurance is considered to be insurance in other contexts. The Supreme Court has held that title insurance companies fall within the definition of "insurance company" as used in the Internal Revenue Code, *United States v. Home Title Ins. Co.*, 285 U.S. 191, 195, 52 S.Ct. 319, 321, 76 L.Ed. 695 (1932), and a sister circuit has held that the "business of insurance" includes the business of title insurance for the purposes of the McCarran–Ferguson Act. *Crawford v. American Title Ins. Co.*, 518 F.2d 217, 218–19 (5th Cir.1975). One state court has stated that "[g]eneral provisions of statutes which relate to all insurance companies apply to title insurance companies where not in conflict or covered by specific legislative act...." *Security Abstract & Title Co. v. Leonardson*, 74 Idaho 528, 264 P.2d 1027, 1029 (1953). While title insurance does not necessarily always fall into the general category of insurance agency activities for all purposes, the Board reasonably concluded that for the purposes of the Garn Act and Exemption G title insurance can properly be deemed an insurance agency activity.

In sum, even if the statute does not compel the Board's interpretation, then it is at least ambiguous with respect to the propriety of bank holding companies' engaging in title insurance activities. Because the Board's construction of the statute is reasonable, we defer to the Board's interpretation and conclude that bank holding companies grandfathered under Exemption G can, consistent with the BHCA, engage in title insurance activities.

### III. PUBLIC BENEFITS TEST

Even if bank holding companies may be authorized to engage in title insurance activities under Exemption G, the Board must still find that a particular proposed activity is in the public interest. 12 U.S.C. § 1843(c)(8) states in part:

> In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices.

ALTA argues that due to the nature of title insurance, consumers shop for it only infrequently and generally only during the period between the signing of a contract to purchase real estate and the closing. Therefore consumers rely for advice and information about obtaining title insurance on others involved in the real estate trans-

---

**4.** See, for example, *First Wisconsin Corp.*, 71 Fed.Res.Bull. 171, 172 (1985) ("[T]he Board does not believe Congress intended to limit exemption G companies to the sale of the precise types of insurance approved by the Board prior to 1971."); *First Bank System, Inc.*, 70 Fed.Res.Bull. 779, 780 n. 3 (1984) (companies that engaged in general insurance agency activities prior to 1971 may continue without restriction as to type of insurance sold, so the fact that the applicant may not previously have sold the exact type of insurance sold by the agency which the applicant sought to acquire does not prevent the Board from approving the application); *First Bank System, Inc.*, 70 Fed.Res.Bull. 657, 658 n. 5 (1984) ("[T]he fact that Applicant may

not have sold the exact type of insurance that company sells does not prevent the Board from approving the application."); *Norwest Corp.*, 70 Fed.Res.Bull. 470, 472 (1984) ("[F]or those companies that engaged in general insurance agency activities pursuant to Board approval prior to 1971, the continued operation of general insurance agencies, without restriction as to type of insurance sold, is permissible under exemption G of section 4(c)(8) of the BHC Act."); *Norwest Corp.*, 70 Fed.Res.Bull. 235 (1984) (companies grandfathered under Exemption G may be authorized to engage in insurance activities in locations other than those in which they engaged in insurance activities prior to 1971).

action, including the real estate broker and mortgage lender. For this reason, ALTA contends that the conduct of title insurance activities by bank holding companies raises greater risks of voluntary tying and foreclosure of competition than bank holding companies' conduct of other insurance activities. ALTA also claims that bank holding companies engaged in title insurance activities are particularly susceptible to conflicts of interest.

In approving First Wisconsin's acquisition of Milwaukee Title, the Board found that there was "no evidence in the record indicating that consummation of First Wisconsin's proposal would result in any undue concentration of resources, adverse effects on competition, conflicts of interests, unsound banking practices, or any other adverse effects." 75 Fed.Res.Bull. at 32. The Board further noted that First Wisconsin would provide a convenient source for title insurance for its customers, and that First Wisconsin had pledged to take affirmative steps to minimize the risk of tying by advising borrowers that they could obtain title insurance from any source. *Id.* The Board thus concluded that the balance of the relevant public interest factors was favorable.

■ The Board's reasoned judgments on the public benefits question "are entitled to some deference in view of its considerable expertise and experience in administering the Bank Holding Company Act." *Connecticut Bankers Ass'n v. Board of Governors,* 627 F.2d 245, 254 (D.C.Cir. 1980) (citations omitted); *Alabama Ass'n*

*of Ins. Agents v. Board of Governors,* 533 F.2d 224, 246 (5th Cir.1976), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). The Board's findings should be taken as conclusive if they are supported by substantial evidence. *Alabama Ass'n of Ins. Agents,* 533 F.2d at 246. We conclude that although the Board's order may have approached the outer boundary of tolerably terse, *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), it was explained in sufficient detail for us to conclude that it was, in fact, supported by substantial evidence.

■ On the benefits side, the Board noted the advantages, in the form of convenience for First Wisconsin's customers, of one-stop shopping.[5] One-stop shopping of this sort has been recognized as a public benefit. *See Independent Ins. Agents of America v. Board of Governors,* 736 F.2d 468, 473 (8th Cir.1984); *Florida Ass'n of Ins. Agents, Inc. v. Board of Governors,* 591 F.2d 334, 338–39 & n. 12 (5th Cir.1979). On the disadvantages side, the Board concluded that there was no evidence that the acquisition would lead to a risk of tie-ins, conflicts of interest, or other unsound banking practices, particularly given the affirmative steps First Wisconsin pledged to take to ensure compliance with all of the laws and regulations prohibiting tie-ins. The Board can rely on such assurances to minimize the risks of tie-ins. *Independent Ins. Agents of America,* 736 F.2d at 473– 75.[6]

**5.** ALTA argues that the Board mistakenly concluded that the acquisition would lead to a *new* source of insurance when, in fact, the acquisition involved a change in ownership of an *existing* source of title insurance. We reject ALTA's contention. In stating that First Wisconsin would provide an additional source for insurance that is particularly convenient for its customers, 75 Fed.Res.Bull. at 32, the Board was merely emphasizing that the availability of title insurance *at a bank* would be new and different.

**6.** Nor did the Board's failure to explicitly discuss the harms and benefits of bank holding companies' engaging in title insurance activities in general run afoul of the statute. Implicit in

the Board's particular public benefits calculation was the conclusion that, at least in some cases, the benefits from allowing bank holding companies to engage in title insurance activities, primarily in the form of convenience to customers, can outweigh the potential harms. We further note that ALTA's contention of anti-competitive effect is singularly unconvincing since all parties seem to agree that First Wisconsin has no market power in the credit market. *Cf. Alabama Ass'n of Ins. Agents v. Board of Governors,* 533 F.2d 224, 250 (5th Cir.1976), *modified on other grounds,* 558 F.2d 729 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) ("the possibility of voluntary tying is inversely related to the availability of other sources of credit").

ALTA also contends that because 12 U.S.C. § 1843(c)(8) requires the Board to consider the *possible* adverse effects of the acquisition, the Board applied the wrong standard in concluding that there was no evidence that the acquisition *would result* in the various adverse effects listed in the statute. 75 Fed.Res.Bull. at 32. We disagree. The Board considered the *possible* adverse effects of the acquisition, as it was required to do by statute, but then decided to give those possible adverse effects relatively little weight in the benefits-adverse effects balance concluding that the possible adverse effects were unlikely to actually occur.

### IV. CONCLUSION

For the foregoing reasons, we defer to the Board's conclusion that grandfathered bank holding companies may engage in title insurance activities under 12 U.S.C. § 1843(c)(8)(G). Further, we find that the Board's public benefits analysis in this case was supported by substantial evidence. ALTA's petition is therefore denied.