**FLORIDA ASSOCIATION OF INSURANCE AGENTS, INC., et al., Petitioners,**

**v.**

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

**Nos. 75–3151 to 75–3153, 75–3342, 75–3343 and 75–3358.**

United States Court of Appeals, Fifth Circuit.

March 19, 1979.

Herbert E. Marks, Thomas E. Wilson, Washington, D.C., John F. Neville, Gen. Counsel, Independent Ins. Agents of America, Inc., New York City, for petitioners.

Theodore E. Allison, Secretary, Robert M. Whiting, Atty., Bd. of Governors of the Fed. Reserve System, Griffin B. Bell, U. S. Atty. Gen., Barbara Allen Babcock, Asst. Atty. Gen., Robert E. Mannion, Associate

Gen. Counsel, Frank A. Rosenfeld, Atty., Appellate Section, Civ. Div., Ronald R. Glancz, Appellate Section, Civ. Div., Dept. of Justice, Washington, D.C., for respondent.

Luther F. Sadler, Jr., Jacksonville, Fla., for intervenor Barnett Banks of Fla., Inc.

Lawrence F. Noble, Eugene Metzger, Washington, D.C., for intervenor Committee to Preserve Consumer Options.

Before BROWN, Chief Judge, GODBOLD and FAY, Circuit Judges.

FAY, Circuit Judge:

This case represents the second of "many episodes in a huge commercial tug-of-war between the bank holding company industry on the one hand and independent insurance agents and other insurance groups on the other." *Alabama Association of Insurance Agents v. Board of Governors of Federal Reserve System,* 533 F.2d 224 (5th Cir. 1976), *aff'd on rehearing* 558 F.2d 729 (1977) (en banc), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). Consolidated for review are decisions by the Federal Reserve Board (Board) to approve proposals by three bank holding companies to become involved in the insurance industry.[1]

As we explained more fully in *Alabama,* the Board is entrusted under § 4(c)(8) of the Bank Holding Company Act of 1956, 12 U.S.C. § 1843(c)(8) (1976) (the Act) with the duty to determine whether a bank holding company may engage directly or indirectly in any non-banking activities. The Board is required to make two determinations. First, it must decide whether a line of business is "closely related" to banking. *Id.* It may do so either by rule or by order. 533 F.2d at 232. The Board has promulgated regulations which outline those activities which are considered "closely related." 12 C.F.R. § 225.4(a)(9) (1976). Certain sections of these regulations were struck down in

1. The applicant bank holding companies are Barnett Bank of Florida, Inc., Chase Manhattan Corp., and Pan American Bancshares. The petitioners are the Independent Insurance Agents

the *Alabama* case. However, the "closely related" test and the validity of § 225.-4(a)(9) are not at issue here. The instant case involves the second requirement of the Act, whether the Board has carried out its statutory obligation under section 4(c)(8) to determine whether the selling of insurance by the applicants meets the public benefits test. Section 4(c)(8) provides:

> [I]n determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices.

12 U.S.C. § 1843(c)(8)(1976).

### I.

On September 29, 1971, Barnett Bank of Florida, Inc. (Barnett), a Florida multi-bank holding company, filed an application with the Federal Reserve Bank of Atlanta for approval to sell insurance. On February 14, 1973, Barnett filed with the Federal Reserve Bank of Atlanta a second application for approval to engage in insurance agency activities for its mortgage banking subsidiary through a newly organized corporation to be known as Barnett-Winston Insurance Agency. In July, 1972, Chase Manhattan Corp., a multi-bank holding company, filed an application with the Federal Reserve Bank of New York for approval to engage in the sale of insurance through Chase's wholly owned subsidiary, Housing Investment Corporation of Florida. On November 22, 1972, a Florida bank holding company, Pan American Bancshares, Inc., filed with the Board an application to acquire an on-going concern, Atico Insurance Agency, through acquisition of its par-

of America, Inc. and the Florida Association of Insurance Agents, Inc. The Board of Governors of the Federal Reserve System is the respondent in these actions.

ent, Atico Financial Corporation. Asserting *inter alia* that approval of the four applications would not result in a net public benefit, the petitioners, the Independent Insurance Agents of America, Inc. and the Florida Association of Insurance Agents, Inc., (IIAA parties), protested each of the four applications and requested a hearing. The applications filed at the Reserve Banks were transferred to the Board for its approval.

The administrative law judge held hearings from June 11 to June 21, 1973 on the applications of Barnett, Chase, and Pan American. Several parties appeared on each side. They presented a total of twenty-two witnesses including bankers, mortgage bankers, economists, insurance agents, and experts in insurance agency operations and in computer systems. The administrative law judge received evidence on the structure of the banking and insurance industries, the nature of the respective markets, the relationship between insurance and banking, the potential premium volume that might be generated by the proposals, the impact of the proposals on the foregoing, and other information which might facilitate the enormously difficult task of assessing whether the applications would result in a net public benefit as prescribed by law. The parties amassed a hearing record of approximately 4,500 pages. In view of the complexity and sheer volume of the evidence presented to the administrative law judge, it is clear that determining whether approval of the applications would result in a net public benefit requires a delicate and complex balancing of interests. *See* 533 F.2d at 253.

The administrative law judge recommended that the applications be approved, subject to the provisos that anticoercion statements be included in all insurance forms furnished by the applicants and that they may be allowed to offer insurance only where they control less than fifteen percent of the banking market.

Subsequent to the administrative law judge's decision, but prior to the Board's review thereof, the Florida legislature passed section 626.988, which generally prohibits banking institutions from engaging in insurance agency activities:[2]

> No insurance agent or solicitor licensed by the department of insurance under the provisions of this chapter who is associated with, under contract with, retained by, owned or controlled by, to any degree, directly or indirectly, or employed by, a financial institution shall engage in insurance agency activities as an employee, officer, director, agent, or associate of a financial institution agency.[3]

Fla.Stat. § 626.988(2) (1977). Section 626.-988 goes on to provide what the Board

---

2. It should be noted that when the hearings were held, Florida and Texas already had statutes which diminished the ability of banks and bank holding companies to engage in the insurance business. Fla.Stat. § 626.747 (1977); Tex. Ins.Code Ann. art. 21.43(c)(3) (supp.1976).

3. For the purpose of § 626.988, the following definitions apply:

    (a) "Financial institution" means any bank, bank holding company, savings and loan association, savings and loan association holding company, or savings and loan association service corporation or any subsidiary, affiliate, or foundation to any of the foregoing. [The] definition shall not, however, include any financial institution which has been granted an exemption by the Board of Governors of the Federal Reserve System pursuant to section 4(d) of the Federal Bank Holding Company Act of 1956, as amended, or any financial institution which neither owns more than ten percent of the capital stock, nor exercises effective control, of a bank, savings and loan association, or entity licensed under chapter 494, Florida Statutes, and licensed or authorized to transact business in Florida. Specifically excluded from this definition is any bank which is not a subsidiary or affiliate of a bank holding company and is located in a city having a population of less than five thousand according to the last preceding census.

    (b) "Insurance agency activities" means the procurement of applications for, or the solicitation, negotiation, selling, effectuating, or servicing of, any policy or contract of insurance other than credit life insurance and credit disability insurance.

    (c) "Financial institution agency" means any person, firm, partnership, or corporate entity which is engaged in insurance agency activities, as herein defined, and is associated with, or owned, controlled, employed, or retained by, a financial institution as herein defined.

Fla.Stat. § 626.988(1)(a)(c) (1977).

described as a few "narrow exceptions"[4] to this general rule. 40 Fed.Reg. 44,622 (1975). To its credit, the Board recognized that the change in Florida law had seriously restricted the range of insurance activities legally open to banks and bank holding companies in Florida.[5] We disagree, however, with the Board's view that it was not obligated to assess carefully whether the new statute altered the calculus of net public benefits under section 4(c)(8).[6]

As we have stated, the parties have presented volumes of information pertinent to the public benefits and adverse effects to be expected from approval of the applications. Yet, in view of the enactment of section 626.988, the Board went only so far as to modify its orders "to more specifically clarify the scope of the permissible insurance activities." 40 Fed.Reg. 44,621 (1975). It apparently received no further input from the parties, and the orders evidence only a superficial consideration of the myri-

ad potential effects of the new law. *See* 40 Fed.Reg. 44,620 (1975); 40 Fed.Reg. 44,624 (1975); 40 Fed.Reg. 44,630 (1975). The Board found that the proposals would result in net public benefits. Accordingly, it approved the applications. The IIAA parties petitioned for review.

## II.

The standard of review is whether the Board's findings are supported by substantial evidence. 12 U.S.C. § 1848 (1976). In *Alabama,* we first had the opportunity to review findings of the Board under section 4(c)(8). There, the Board's findings differed considerably from the findings of the administrative law judge. Although we noted that the Board's expertise in the banking industry is entitled to some deference, we added that where the Board differs with the administrative law judge's findings, it must adequately explain its reasons. 533 F.2d at 246–47. Accordingly, we reversed the Board's findings on two of the

---

**4.** Section 3 of the statute provides:

Notwithstanding any other provisions of this section, an insurance agent or solicitor licensed by the department of insurance under the provisions of [chapter 626, Florida Statutes,] who is affiliated with, under contract with, retained by, or owned or controlled directly or indirectly to any degree by, a bank holding company subsidiary or affiliate, which is not a bank, licensed and operating primarily under chapter 494, Florida Statutes, may engage in insurance agency activities if permitted by the Board of Governors of the Federal Reserve System, but only to the extent that such activities are directly related to the extension of credit, specifically real estate mortgage loans made or brokered by licensees under chapter 494, Florida Statutes, and only to the extent necessary to protect the real property which is subject to the mortgage loan against loss or damage. With respect only to residential property consisting of not more than four individual dwelling units, such agent or solicitor may offer a policy affording insurance on the primary residence, appurtenant structures, personal property, and personal liability, but excluding any insurance customarily written under an inland marine form. In addition, such agent may offer decreasing term life insurance on the life of the borrower not to exceed the amount and term of the mortgage.

Fla.Stat. § 626.988(3) (1977).

**5.** Section 7 of the Act preserves the jurisdiction of the states over banks and bank holding com-

panies: "The enactment by the Congress of this chapter shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to banks, bank holding companies and subsidiaries thereof." 12 U.S.C. § 1846 (1976).

**6.** The following statement contains the Board's sole consideration of the effects of the change in Florida law:

It has been suggested by NAIA that, in light of the new legislative prohibitions of the Florida statute limiting Applicants' entry into insurance agency activities, the public benefits claimed from subject entry should be reexamined. The Board recognizes that some diminution of the public benefits discussed supra may likely result from a more limited form of entry into insurance agency activities. However, on balance, it is the Board's view that sufficient public benefits would exist following Applicants' entry into those insurance agency activities now permitted by Florida law as to outweigh any possible adverse effects resulting from such entry.

40 Fed.Reg. 44,623 (1975). We are not empowered to excuse the Board from at least making a finding with respect to how licensing requirements and other laws will affect the "calculus of net public benefits."

three public benefits criteria on the basis that they were not supported by substantial evidence. There remained, however, a sufficient net public benefit to uphold the Board's approval of the applications. Here the Board failed to take into account the impact of an intervening change in Florida law, a problem which was not ruled upon in *Alabama*.[7] Thus, the question is whether the initial decision was so well founded that it need not be reconsidered in light of a significant change in the legal environment in which the applicants intend to do business. In order to make this determination, we must review the findings of the administrative judge and of the Board with respect to the criteria enumerated in section 4(c)(8) of the Act.

### 1. Greater Convenience

The administrative law judge found the degree of increased convenience likely to result from approval of the applications to be "minor." He noted that a large number of independent brokers offer services at many locations and that Barnett[8] was the only applicant which proposed to sell insurance from each of its locations.[9] Finally, with respect to real estate insurance, the primary market remaining available to banks due to the prohibitions of section 626.988, the administrative law judge found that the convenience proposed to be made available by "one-stop shopping"[10] is already available via the sale of property insurance over the telephone. On review, the Board found that greater convenience was likely to result from approval of the applications. It based its decision on the advantages of one-stop shopping, elimination of the duplication of information, and the convenience of combining loan installments and insurance premiums in a single payment. The Board failed to explain in any detail the impact of Florida Statute section 626.988 with respect to its finding of greater convenience.[11]

The Board could not follow its mandate under section 4(c)(8) without considering the effect of the new Florida law, which is likely to reduce the economic feasibility of offering insurance at a number of locations and thereby reduce the convenience afforded by the plan. By foreclosing the banking industry from practically all insurance sales, section 626.988 may have reduced substantially the "convenience" and "one-stop" advantages which may have resulted before. We cannot determine precisely what the impact of the law will be on these proposals. This forum is peculiarly unsuited to making such determinations and it is

7. In *Alabama,* the IIAA parties argued that the Board failed to consider the effect of an intervening Georgia statute. The statute, however, exempted the applicants in that case and it was therefore unnecessary to rule any further on the contention. 533 F.2d 252–53. Nevertheless, the *Alabama* opinion guides us in our decision here.

8. Barnett has subsequently indicated through counsel that the change in Florida law has diminished its economic interest in the outcome of the case and that it did not plan to participate in further litigation. Letter from counsel for Barnett to Gilbert F. Ganucheau, Chief Deputy Clerk, United States Court of Appeals for the Fifth Circuit (May 19, 1978). We are left to guess whether this diminished economic interest will cause Barnett to decrease its number of outlets, thereby reducing the degree of convenience afforded by the proposal. Barnett's change of position represents perhaps the most persuasive indication that the new Florida law seriously upsets the calculus of net public benefits.

9. We are especially mindful of the basis upon which this Court reversed the Board's determination of greater convenience in *Alabama*. In that case, we pointed out that the Board must take account of the decrease in convenience resulting from the failure of the banks to propose the sale of insurance at a number of locations instead of offering it only at central locations. 533 F.2d at 247. Under Florida law, "[e]ach branch place of [insurance] business established by an agent or agency firm, corporation, or association, shall be in active full-time charge of a licensed general lines agent." Fla.Stat. § 626.747(1) (1977). Thus, a bank could not sell insurance through a branch by consummating the insurance contract through a central agent. Although this statute was effective at the time of the submission of the applications, we note that neither the administrative law judge nor the Board considered its impact on the applications.

10. "One-stop shopping" refers to the advantage of banks offering insurance, whereby a borrower would have to go no further to insure or to pay his insurance bill on property which he has financed with the bank. 533 F.2d at 247.

11. *See* note 6 *supra*.

for this reason that Congress has entrusted the Federal Reserve Board with this difficult task in the first instance. *See Whitney National Bank in Jefferson Parish v. Bank of New Orleans and Trust Company,* 379 U.S. 411, 421, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965). *Cf. American Bancorporation, Inc. v. Board of Governors of Federal Reserve System,* 509 F.2d 29, 39 (8th Cir. 1974) (Board decision remanded for trial-type hearing on issues "crucial to a determination of whether the public benefits reasonably to be expected . . . override any adverse effects"). Therefore, we cannot uphold the Board's decision on this issue.[12]

### 2. Gains in Efficiency

The Board found that gains in efficiency would result from approval of the applications. The reasons given by the Board were i) the reduction or elimination of advertising and solicitation expenses; ii) lower overhead; and iii) the use of existing computer facilities for billing operations. This conclusion is not entirely inconsistent with the administrative law judge's recommendation which stated that approval may lead to "minimal" public benefits in terms of efficiency. The administrative law judge, however, based this determination on his view that gains in efficiency will result

primarily from "larger scale operating economies."

When the administrative law judge made his decision in this case, Florida Statute section 626.988 had not been enacted. By the time the applications came before the Board, the statute was in effect. In concluding that approval of the applications would result in net efficiencies, the Board relied on this change in Florida law. It reasoned that since the new law provided basically that banks could sell insurance only when it was "directly related" to the extension of a real estate loan, they would achieve a reduction in advertising and solicitation costs. In addition, it reasoned that due to the new proscriptions of Florida law, all of the banks' insurance customers will be "one-stop" customers; the only insurance purchasers will be those already at the bank for a loan.[13] The situation is not so clear. The large scale operating efficiencies which were important to the administrative law judge's finding of "minimal" efficiency benefits may now be impossible to achieve in view of the limited types of insurance which the applicants now may handle in Florida. The applicants may no longer be able to generate the volume necessary to obtain these efficiencies. It is insufficient under section 4(c)(8) for the Board to make

12. We do not mean to suggest that the Board's findings that there would be greater convenience (in the form of one-stop shopping and single billing) are erroneous with respect to those locations where such insurance is actually offered for sale by the applicants. We merely require that the Board consider the lessening of convenience benefits resulting from the possible decrease in the number of outlets where insurance will be offered, due to the change in Florida law.

13. Petitioners argue that the Board's efficiency gains findings are erroneous because the Board did not discuss in its opinion efficiency losses that might result from the non-use of "direct billing" by the banks. They assert that *Alabama* requires the Board to discuss specifically an applicant's proposal not to use direct billing. (Direct billing is a practice whereby insurance underwriters issue policies to the customer and bill him directly. The agent simply initiates the process. *See* 533 F.2d at 248.) Petitioners misread the portion of *Alabama* dealing with direct billing. The *Alabama* admonition that "net efficiency gains" must be found by the Board, *id.,* should be read as instructing the Board that it must consider *all* of the evidence

submitted and not merely the evidence favoring its conclusion, as was done in *Alabama* where the Board ignored the administrative law judge's conclusion that the non-use of direct billing would result in a net efficiency loss. Here the administrative law judge compared the likely efficiency of the bank-affiliated insurance operations with the efficiency of non-affiliated insurance agencies that utilize direct billing and concluded that there would be efficiency gains associated with the bank operations. The Board in its orders did not make such an explicit comparison with direct billing insurance agencies, but it did adopt the findings of the administrative law judge as its own except as modified in its order. To reject this finding merely because the Board did not explicitly discuss direct billing in its order, when the administrative law judge (and by incorporation, the Board) made *direct comparisons* between the banks' proposals and direct billers' operations and then concluded that there would be efficiency gains, would be to elevate form over substance. The Board considered all relevant factors and did not in this respect ignore any adverse findings of the administrative law judge.

casuistic predictions as to the impact of Florida law on the likelihood of public benefits resulting from the approval of these applications. This change in the business milieu is sufficiently significant that a more detailed inquiry is in order.

### 3. Increased Competition

The Board and the administrative law judge concluded that even though approval of the applications was unlikely to lead to increased price competition, increased service competition was a probable result. It must be borne in mind that any findings of increased competition were supported, as were the conclusions with respect to efficiency, by arguments which may have been vitiated by the enactment of section 626.-988. For example, the administrative law judge noted that Barnett and Barnett-Winston planned to put forty-three additional insurance agencies into operation.[14] Such a large influx of competitors may very well increase competition. The applicants also argued that their projected high volume of business would enable them to enjoy greater efficiencies and to extract lower prices from the insurance underwriters. However, both of these contentions lose much of their persuasiveness under the law as it now stands in Florida. Since the Board relied upon these arguments without fully considering the impact of the recently enacted legislation in this area, we must decline to uphold its conclusion with respect to this issue as well.

### 4. Adverse Effects

In view of our decision with regard to the public benefits aspects of the net public benefits analysis, the Board's approval of the applications must be reversed. Since we require the Board to reassess more carefully each of its findings with respect to the quantum of public benefits likely to result from approval of the applications, it is impossible for us to uphold the Board's overall conclusion that there is a likelihood of net public benefits resulting from the approval of these applications. Thus, even if we were to find that the Board was correct in concluding that the proposed activities would result in no significant adverse effects as defined in the Act, we could not affirm its overall decision.[15] However, to assist the Board on remand we point to other errors that we see in the Board's assessment of the likelihood and significance of adverse effects.

In *Alabama* we held that where the Board differs with the administrative law judge without clearly explaining its reasons for disagreement, the Board's finding will be "vulnerable" on review. 533 F.2d at 247. In the present case there is such an unexplained conflict between a finding of the administrative law judge and a finding of the Board. The administrative law judge found that approval of the applications would produce "large concentrations" of market power, which would in turn drive many smaller competitors out of business or into mergers producing larger combinations. He concluded that the increased concentration "would decrease competition within the insurance industry" and would have the additional adverse effect of reducing the opportunity for single individuals to become managers or proprietors of insurance agencies. Thus the administrative law judge found that at least one of the statutorily-mentioned "adverse effects" would result from approval of the applications—"de-

---

14. A full time licensed agent would have to be in charge of each of these forty-three locations. Fla.Stat. § 626.747 (1977). Thus, the combination of section 626.988, which may substantially reduce sales volume, and section 626.747, which will result in higher costs, may effect substantial changes in the economies involved here.

15. When the public benefits test was added to the bill on the floor of the House in 1969, Mr. Patman stated that "[t]he purpose of this amendment is to require the Federal Reserve Board to carefully scrutinize the activities of each bank holding company and its subsidiaries . . . [T]he Board must still find, after a detailed and careful review, that the benefits to be derived by the public from the holding company or subsidiary engaging in a particular activity clearly outweigh the possible adverse effects of their engaging in activity [sic]." 115 Cong.Rec. 33139 (1969).

creased . . . competition." In addition, he found an adverse effect not listed in the statute [16]—the reduction of opportunities for individual entrepreneurs. Although he did not use the precise statutory language, the administrative law judge obviously also thought that approval would produce an "undue concentration of resources." [17]

The Board explicitly approved the administrative law judge's conclusion that increased service competition would result from approval of the applications, yet failed, as the Board concedes in its brief, to mention the administrative law judge's specific finding that approval would lead to anticompetitive effects in the insurance industry.[18] Under *Alabama* this failure alone would require that the Board's finding on this point be set aside for lack of substantial support in the record.[19]

Thus, on remand the Board should discuss the administrative law judge's finding of anticompetitive effects and explain why it disagrees with it or why this adverse effect is outweighed by the public benefits attendant upon approval of the applications. Likewise the Board should discuss whether approval would result in an "undue concentration of resources" or in a deprivation of economic opportunities for entrepreneurs, and, if so, whether these adverse effects are outweighed by expected public benefits.

It is not necessary that the Board's other findings with regard to adverse effects be discussed here.

### III.

■ The IIAA parties also contend that approval of these applications will violate Texas[20] and Florida laws. Texas law requires any person soliciting insurance in Texas to possess a Texas recording agent's license. Tex.Ins.Code Ann., art. 21.14, § 4 (1963). In order for a corporation to obtain such a license, "every officer, director and shareholder of the corporation [must be] individually licensed." *Id.* § 3(c)(2). Thus, the IIAA argues, Barnett-Winston under its existing corporate structure could not legally obtain a license. Section 626.747, Florida Statutes, requires that there be a licensed insurance agent at each location at which insurance will be sold. Two of the applicants do not propose to have a licensed agent at each location where insurance will be sold and their proposals would seem to violate the statute.

In *Alabama,* the IIAA parties also argued that the Board failed adequately to consider violations of Georgia and Alabama law in approving applications quite similar to those in the instant case. 533 F.2d at 252–53. Georgia had passed a statute prohibiting lending institutions from selling insurance other than credit life, accident or health in communities of over 5,000 persons. Ga.Code Ann. § 56–322 (1977). In terms of its potential impact on the advisability of approving the applications, this law is comparable to the Florida statute at issue here. However, the Georgia statute included a "grandfather clause" which exempted the applicants in the *Alabama* case. Consequently, we did not reach the issue of how carefully the Board should have examined possible violations of the Georgia statute.

The Alabama statute involved in the *Alabama* case provided that only licensed insur-

16. Nothing in the language of § 4(c)(8) suggests that the lists of adverse effects and public benefits included there are intended to be exhaustive.

17. He found that approval would result in "large concentrations" of market power. He did not in so many words conclude that this concentration would be "undue."

18. The Board did conclusorily state that because of the *de novo* nature of the entry of all except one of the applicants, no "undue concentration" would result from approval.

The Board did not discuss the *competitive* effects of greater concentration and did not advert to the initial factfinder's specific conclusion that there would be anticompetitive effects.

19. The Board's failure is perhaps explained by the ALJ's having inserted his discussion of anticompetitive effects into the section of his opinion dealing with greater concentration of resources.

20. Barnett-Winston is the only applicant which plans to operate in Texas.

ance agents could deal in insurance. Ala. Code tit. 28A, § 119(a) (Supp.1974). The IIAA contended that "[s]ince Southern's [the applicant's] plan contemplated that only a single agent at its central insurance office would be licensed . . . the reference of bank customers to the agent by loan officers and the compilation of insurance information by the loan officers would be illegal." 533 F.2d at 252. We upheld the Board in its "apparent assumption," *id.* at 253, that the applicants would comply with the Alabama laws. We based this decision on the deference to which we felt the Board was entitled in striking a balance between the protestant's need for specific proposals and the desirability of granting flexibility to applicants entering a field in which they have no experience.

We do not agree with the IIAA's position on this point. As in *Alabama,* we decline to deny the Board the power to make reasonable assumptions [21] with respect to whether section 4(c)(8) applications will comply with state laws.

## IV.

Nevertheless, once the Board has made a determination (or an assumption) with respect to the legality of an applicant's proposal, it is specifically directed by statute to consider whether approval of the application "can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests or unsound banking practices." 12 U.S.C. § 1843(c)(8).

In *Whitney Bank,*[22] the Supreme Court explained the proper role of the Board in making a similar public benefits determination under a companion section of the Bank Holding Company Act, 12 U.S.C. §§ 1842(c)(4) and (5) (1958), which directs the Board to consider " 'the convenience, needs, and welfare of the communities and the area concerned' " and " 'whether or not the effect of such acquisition [of shares in a bank by a bank holding company] . . . would be to expand the size or extent of the bank holding company system involved beyond limits consistent with . . . the public interest' ". The Court found that the determination as to the "applicability and effect" of state law on public benefits criteria under the Act is "the very type of question that Congress envisioned as being resolved in the first instance by the Board." 379 U.S. at 425, 85 S.Ct. at 560. The Court further stated that it would hardly be consistent with the public interest to approve a plan which violated the law. *Id.* at 418–19, 85 S.Ct. 551. The basic principle is clear that the Board cannot ignore the applicability and effect of state law inasmuch as it bears upon the public interest determination required by the Act. 12 U.S.C. § 1843(c)(8). The Board has done so here.

Accordingly, we remand these cases to the Board with the following instructions. The Board must remand these cases to the administrative law judge, who shall require the applicants to amend their proposals in a manner consistent with Texas and Florida law.[23] The administrative law judge should allow the parties to introduce evidence with

---

21. We do not intend to grant to the Board a license to disregard the question of whether approval of an application would result in violations of state law. The *Alabama* case was our first attempt to deal with this difficult and evolving area. We are sure that Judge Thornberry's thoughtful opinion in that case has aided the administrative law judge, the Board, and this and other Courts in developing this body of law. As pointed out in *Alabama,* as the Board and the banking industry gain more experience in this area, we will expect, in fairness to any challengers of the applications, that the proposals of the applicants and the findings of the Board will be more concrete.

22. We note that the case was disposed of on procedural grounds. However, in order to decide the issue of exclusive jurisdiction involved in the case, it was necessary for the Court to explicate the function of the Board under the Act.

23. As we have stated, the apparent inconsistencies between the applicant's proposals and state law do not under *Alabama* require us to reverse and remand the Board's decision. However, since the parties will be introducing additional information consistent with this opinion and since they will have had additional time to consider their proposals, in the inter-

respect to the effect of Texas and Florida law on the public benefits criteria enumerated in section 4(c)(8). Both the administrative law judge and the Board should then consider and review these applications in accordance with the statutory criteria discussed in *Alabama*.

Reversed and remanded for further proceedings consistent with this opinion.

ests of economy and fairness, we include this requirement in our order. In addition, since Barnett-Winston's proposal was to sell insurance both in Texas and Florida, we cannot separately uphold the Board's findings with respect to the Texas operations. The administrative law judge should view the proposals as a whole.

