**INDEPENDENT INSURANCE AGENTS OF AMERICA, INC., and Independent Insurance Agents of Missouri, Inc., Petitioners,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

**Intervenor (Commerce Bancshares, Inc.) For Respondents.**

**INDEPENDENT INSURANCE AGENTS OF AMERICA, INC., and Independent Insurance Agents of Missouri, Inc., Petitioners,**

v.

**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, Respondent.**

**Intervenor (Mercantile Bancorporation, Inc.) For Respondents.**

Nos. 83–1818, 83–1819.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1984.

Decided June 13, 1984.

Rehearing and Rehearing En Banc Denied Aug. 1, 1984.

J. Paul McGrath, Asst. Atty. Gen., Civil Div., Dept. of Justice, Washington, D.C., Michael Bradfield, General Counsel, Richard M. Ashton, James E. Scott, Attys., Board of Governors of the Federal Reserve System, Washington, D.C., for respondent.

Thomas E. Wilson, John B. Beaty, Charles, Karalekas, McCahill & Wilson, Washington, D.C., for petitioners.

Bryan, Cave, McPheeters & McRoberts, Thomas C. Walsh, James E. DeFranco, St. Louis, Mo., for intervenor; Maryln Golub, Kansas City, of counsel.

Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

HENLEY, Senior Circuit Judge.

The Board of Governors of the Federal Reserve System (the Board), the respondent in this case, approved the applications of the intervenors, Commerce Bancshares, Inc. (Commerce) and Mercantile Bancorporation, Inc. (Mercantile), both bank holding companies, to sell certain kinds of insurance. The Independent Insurance Agents of America (IIAA) have petitioned this court to review the Board's orders, arguing that it is not in the public interest for Mercantile and Commerce to sell insurance. 12 U.S.C. § 1843(c)(8). We disagree, and affirm the Board's orders.

## I. BACKGROUND.

The Bank Holding Company Act, 12 U.S.C. § 1841 *et seq.*, generally prohibits a bank holding company from engaging in nonbanking activities. 12 U.S.C. § 1843. Until 1982, an exception to this rule was contained in § 4(c)(8) of the Act. 12 U.S.C. § 1843(c)(8) (1980). That exception, which remains applicable here due to a grandfather clause in the 1982 law,[1] allows bank holding companies to engage in nonbanking activities if the Board finds the activity to be "closely related" to banking and to benefit the public. 12 U.S.C. § 1843(c)(8) (1980); *see generally Independent Ins. Agents of America, Inc. v. Board of Governors,* 658 F.2d 571, 573 (8th Cir.1981) (hereinafter *Mercantile I*); P. Schweitzer & S. Halbrook, *Insurance Activities of Banks and Bank Holding Companies,* 29

---

1. Garn-St. Germain Depository Institutions Act of 1982, Public Law 97–320 (codified in relevant part at 12 U.S.C. § 1843(c)(8) (1984)).

Drake Law Review 743 (1979–80) (hereinafter Schweitzer & Halbrook). This court explained the process in *Mercantile I*:

> The Board, in reviewing an application under 12 U.S.C. § 1843(c)(8), must make two separate determinations before such application can be approved. First, it must determine whether, as a general matter, the proposed activity is closely related and incidental to banking. *See, e.g., Connecticut Bankers Ass'n v. Board of Governors of the Federal Reserve System*, 627 F.2d 245, 249 (D.C.Cir. 1980). Second, it must determine whether the public benefits of the proposed activity will outweigh potential adverse effects. *Id. Accord, Independent Ins. Agents of America v. Board of Governors of the Federal Reserve System*, 646 F.2d 868, 869 (4th Cir.1981) (per curiam). Twelve U.S.C. § 1843(c)(8) provides that in making the second determination, often referred to as the "public benefits" test, the Board must consider whether approval of the application "can reasonably be expected to produce benefits to the public...." Under this two-step procedure, the Board can find that the proposed activity is closely related to banking in general but, nevertheless, deny the application because it fails the 'public benefits' test. *See, e.g., Connecticut Bankers Ass'n v. Board of Governors of the Federal Reserve System, supra*, 627 F.2d at 249–250, 250 nn. 19–21.

658 F.2d at 573.

Mercantile and Commerce seek approval to sell insurance that is "directly related to an extension of credit." Generally, the bank holding companies seek to sell insurance to protect property that is collateral for a loan; specifically, for example, they wish to sell car insurance, both collision and liability, to bank customers who borrow money for the car from the bank. *See Alabama Ass'n of Ins. Agents v. Board of Governors*, 533 F.2d 224, 244 (5th Cir.1976) (hereinafter *Alabama Agents*) *modified*

on other grounds, 558 F.2d 729 (5th Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). The Board has established by regulation that this kind of limited insurance activity is "closely related" to banking, 12 C.F.R. § 225.4(a)(9) (1980),[2] and the applicability of the regulation is not at issue.

The second part of the test is whether such limited insurance activity benefits the public. This part of the test involves weighing the pros and cons of each application, and is decided on a case-by-case basis. *Connecticut Bankers Ass'n v. Board of Governors*, 627 F.2d 245, 249 (D.C.Cir. 1980).

## II. THE APPLICATIONS AND PROCEEDINGS.

Mercantile filed its application in February, 1979. The Board approved Mercantile's application without a hearing even though the IIAA had objected to the application and specifically requested a hearing. IIAA appealed to this court, which held that "the Board cannot lightly dismiss a protestant's request for an evidentiary hearing." *Mercantile I*, 658 F.2d at 574. The court determined that an evidentiary hearing must be held when "a material fact is contested and the protestant has made a minimal showing that a substantial inquiry would be worthwhile." *Id.* The court found that IIAA had contested material facts concerning several aspects of Mercantile's application, and remanded for a hearing. The Board was directed to allow the presentation of testimony and documentary evidence on the following issues:

> (1) the precise manner in which the "de novo" entry is to be affected; (2) the general cost of insurance to be issued by MBI in comparison to insurance issued by independent agencies; (3) the potential conflict of interest which may result when, as planned, Mercantile's loan officer and insurance agent will be the same person; (4) the potential for tying (coer-

---

**2.** The 1982 amendments expressly state that this kind of insurance activity is *not* "closely related" to banking, but, as noted *supra,* the amendments do not apply here. 12 U.S.C. § 1843(c)(8) (1984).

cive and voluntary) the issuance of loan approval to the purchase of insurance; and (5) the competitive impact of MBI's entry into the relevant insurance market in relation to existing insurance agencies. *Id.* at 576 (footnotes omitted).

On remand, the hearing on Mercantile's application was consolidated with a hearing on Commerce's application, which had been filed in September, 1981. An Administrative Law Judge (ALJ) issued findings of fact and recommended that Commerce's application be granted. The ALJ recommended that Mercantile's application be denied because of the ALJ's view that Mercantile did not recognize its fiduciary duty to provide insurance at the lowest practicable cost. The Board for the most part adopted the ALJ's findings and recommendations. It granted Commerce's application and Mercantile's application after a showing that Mercantile recognized it was under a fiduciary duty to provide insurance at the lowest practicable cost.

## III. ISSUES.

There are four issues in this case. The first is whether Mercantile's application was specific enough. The second is whether Commerce and Mercantile have shown that the benefits to the public outweigh the possible adverse effects from granting the application. The third issue is whether the Board's orders are inconsistent with Missouri law, and the final issue is whether the Board's orders are inconsistent with another federal statute, 12 U.S.C. § 92.

*a. Specificity of Mercantile's application.*

■ A bank holding company's application to engage in non-banking activities must be fairly specific. *Alabama Agents,* 533 F.2d at 253. This is required so that the Board can determine whether the particular holding company's plan will benefit the public, and so that any protestants can challenge the application in a responsive manner.

IIAA contends that Mercantile failed to meet this standard. It further relies on

this court's direction in *Mercantile I* that evidence be presented on the "precise manner" in which Mercantile planned to enter the insurance business. 658 F.2d at 576. According to IIAA, the court "expected the Mercantile hearing to reveal the exact method by which Mercantile proposes to act as agent in the sale of property and casualty insurance." Brief of Petitioners at 19. IIAA contends that this was not done.

■ Examination of Mercantile's application reveals that Mercantile proposes to act as agent for the sale of the following kinds of insurance:

I. Physical damage insurance on property used as collateral for an extension of credit or the provision of other financial services in Applicant's banking and non-banking subsidiary offices located in the state of Missouri, such as fire insurance on improved real property, fire and inland marine insurance on household contents, boats, and equipment, physical damage insurance on mobile homes, including dual and single interest coverage, and collision and comprehensive coverage on automobiles, including dual and single interest coverage;

II. Insurance customarily sold as part of an insurance package with or in conjunction with insurance that protects the collateral as described in paragraph 1 above, such as automobile liability insurance and comprehensive personal liability coverage contained in a homeowners' and mobile homeowners' insurance policy.

Application of Mecantile Bancorporation, Inc., September 28, 1979, at 4; D.R. at 65. In its application and supporting documents, Mercantile stated that it would sell insurance through a wholly owned subsidiary, MBI Insurance Agency, which will retain all commission income. Individual banks will be reimbursed by the Agency for expenses. A licensed insurance agent will be employed at the principal office of each bank. The agent will probably work only part of the time on insurance matters, and will have other duties; in most cases

he or she will also be a loan officer. The agent's compensation will be in no way dependent on the amount of insurance he or she sells. Mercantile also stated that it planned to allow customers to finance their insurance premiums for insurance bought through the banks.

During the hearing, it was further established that Mercantile might employ more than one agent at some of the larger banks. Mercantile presented evidence that it would hire a full-time insurance expert to organize the business, train and supervise agents, and answer agents' questions once the program was established. Finally, Mercantile committed that there would be no discussion with a customer of Mercantile's insurance offerings prior to approval of the customer's loan.

The ALJ found that "[t]he general type of insurance to be sold is clear. The major lines to be sold are clear." The ALJ also concluded that Mercantile presented a "fairly specific proposal" and that "the unresolved or doubtful matters to which protestants point are matters of detail, which have not impaired the Board's ability to make the required determination or protestants' opportunity to challenge that proposal." Mercantile opinion of the ALJ at 24. The Board agreed.

As the Fifth Circuit pointed out in *Alabama Agents*, whether an application is specific enough is "a question on which the Board must be considered to have some expertise." 533 F.2d at 253. IIAA points to no specific prejudice resulting from Mercantile's approach, and the application and other information provided by Commerce was only slightly more specific. We consider that the application and the evidence presented at the hearing provided IIAA and the Board with sufficient information on Mercantile's plans.

### b. Public benefits.

The statute requires the Board to weigh the potential benefits of the holding company's entry into the non-banking activity against the possible adverse effects of the entry. Specifically, § 4(c)(8) mentions

gains in convenience and efficiency, increased or decreased competition, undue concentration of resources, and unsound banking practices. 12 U.S.C. § 1843(c)(8).

In this case the primary benefits from the approval of the applications of Commerce and Mercantile would be greater convenience and increased competition. The ALJ found it self-evident that consumers would be interested in "one-stop shopping." Buying their insurance from their bank would save a customer the time it would take to contact an outside insurance agent and to provide the agent with information already in the bank's possession, and it would allow the customer in some cases to take possession of the collateral sooner. The ALJ also considered that increased competition would result from the de novo entry of a new competitor in the field. The ALJ noted that the competition would probably be related to the service and convenience of banks rather than to price.

Possible adverse effects from the entry of Commerce and Mercantile into the insurance business are tying, conflicts of interest, and unreasonably high prices. Tying might be either coercive, as when a bank conditions the approval of a loan on the purchase of insurance, or "voluntary," as when a customer might feel he should buy the bank's insurance in order to keep on good terms with the bank. *See* Schweitzer & Halbrook, 29 Drake L.Rev. at 753. A conflict of interest might arise when the loan officer-insurance agent allows his desire to sell insurance to interfere with his fiduciary obligation to the customer to procure the insurance product which best meets the customer's needs. Finally, the bank holding companies might take advantage of the automatic market for insurance customers and sell the insurance at an unacceptably high price.

The Board is certainly correct in its conclusion that some members of the borrowing public will find it convenient to purchase their insurance at the same time and place they receive a loan. *See Florida Ass'n of Ins. Agents v. Board of Gover-*

*nors*, 591 F.2d 334, 339 n. 12 (5th Cir.1979) (*Florida Agents*).

As to competition, the mere fact of new entries into the field is indicative of some degree of increased competition. *Alabama Agents*, 533 F.2d at 249. Mercantile and Commerce contend that they will provide excellent service as well, since they have an interest in the insured property. It does appear that there may be some increase in competition based on quality and convenience of service. *See id.* The banks further contend that they will be able to compete more effectively in the sub-area of banks who sell insurance. They note that a major Missouri bank is already authorized under § 4(c)(8) to sell property and casualty insurance, and that their entry will provide competition in this field. We agree that increased competition may result in this area. *Id.*

On the negative side, IIAA produced convincing evidence which showed that both Commerce and Mercantile may have tied credit to the purchase of credit life insurance in the past. Evidence of high "penetration rates" in the credit life field was presented on both banks, as well as evidence that Commerce rewarded employees who sold substantial amounts of credit life with recognition and awards. In Mercantile's case, the ALJ concluded that "the most reasonable inference is that some kind of tying accounts at least in part" for the high penetration rate. Mercantile opinion of the ALJ at 51. In Commerce's case, the ALJ concluded that "the inference some tying occurred is compelling." Commerce opinion of the ALJ at 39.

The ALJ first noted that coercive tying is expressly prohibited by § 106 of the Act. 12 U.S.C. §§ 1971–78. It is the Board's position that "absent unusual circumstances associated with a particular application, there [are] as a general matter no significant adverse effects such as voluntary tying inherent in each sale." Mercantile opinion of the ALJ at 46; Commerce opinion of the ALJ at 34. The ALJ recognized that his finding that both Mercantile and Commerce had engaged in tying in the past

required more than reliance on the Board's generalized statement that voluntary tying is unlikely to occur. He considered the likelihood of tying to be diminished by the commitments of Mercantile and Commerce that, one, extensions of credit would not be conditioned, expressly or impliedly, on the purchase of insurance; two, customers would be advised in writing that they could choose the source of their insurance; and three, a customer would not be informed that the bank sells insurance until after the loan has been approved. Commerce's application was approved subject to the condition that Commerce would not engage in internal promotional activities designed to encourage insurance sales. The ALJ also relied on the lack of market power in the credit field possessed by Mercantile and Commerce and on the large number of alternative sources of property and casualty insurance to conclude that there was not a serious possibility of tying.

The evidence in these cases of high penetration rates in credit life insurance sales is disturbing. Even granting that there are some differences in the sale of credit life insurance and in the sale of property and casualty insurance, a history of tying is certainly grounds for an inference that tying will occur in the future. This should weigh heavily against the bank holding companies.

However, here the ALJ and the Board extracted stringent commitments from the two holding companies. In addition to those discussed in this regard by the ALJ, we note that the banks also promised to instruct their agents that coercive tying is illegal and that it is against company policy for an agent to imply that an insurance purchase would result in favorable treatment. Further, insurance agents will not be compensated based on the amount of insurance sold.

We have no reason to believe that Commerce and Mercantile will not comply with these commitments, which are clearly spelled out in the Board's decision and in our opinion. These commitments are binding on the banks, and the Board has the

authority to enforce such commitments. 12 U.S.C. § 1818(b)(1).

Given the stringent commitments made by the banks and the Board's authority to enforce the commitments, we find that the Board's conclusion that there is only a slight possibility of voluntary tying is supported by substantial evidence.

As to conflicts of interest, IIAA argues that Mercantile and Commerce would have an interest in selling insurance in every possible instance, regardless of whether it would be in the customer's best interest; for instance, the banks might fail to inform customers of "fleet" discounts available for coverage of a second car.

■ The ALJ noted that while bank insurance agents would receive no additional compensation for insurance sales, "it must be recognized that an employee may be motivated to further what he perceives to be his employer's interests even in the absence of a direct pecuniary incentive." The Board recognized this potential problem, but again relied on commitments made by the banks in determining that harmful conflicts of interest were unlikely. The banks both committed to advising customers of potentially lower rates or discounts available in certain situations. Further, both banks recognize that they are in a fiduciary relationship with their customers regarding insurance sales. In view of these commitments, we find substantial evidence to support the Board's conclusion that the possibility that customers will be harmed by an agent's conflict of interest is slight.[3]

The final public benefits question that must be considered is the cost of the insurance the bank holding companies plan to sell. If the bank holding companies plan to sell insurance at a low rate, it would increase competition and be in the public interest. If the bank holding companies sell insurance at a high rate, that would be a definite adverse effect which could easily overcome the benefits. Neither holding company introduced evidence that it would sell insurance at a lower rate. Rather, the holding companies merely indicated that they would sell insurance at the "lowest practicable cost."

It is difficult to tell exactly what insurance purchased through Mercantile and Commerce will cost. It was shown at the hearings that it is the underwriter who establishes the premium, subject to the approval of state insurance authorities. However, neither bank has yet made arrangements with an underwriter. The only other evidence in the record on cost was presented by IIAA. It concerned the price of credit life insurance sold by Mercantile and Commerce, and established that Mercantile and Commerce charged 40% more for credit life than did Prudential Insurance Company.

The Board did not consider this evidence harmful, since it regarded the sale of credit life insurance as substantially different from the sale of property and casualty insurance. The Board further relied on commitments from the bank holding companies. Both Commerce and Mercantile recognized they had a fiduciary duty to sell insurance at the "lowest practicable cost."[4] The Board interpreted this duty to mean that

a holding company should put aside its own interest in obtaining a commission and make a reasonably diligent effort to obtain the insurance for the customer on the best possible terms, including the lowest cost. Since the fiduciary duty to obtain insurance is limited by concerns of practicability, however, the holding company should also consider the quality of the services to be provided in determining what constitutes the lowest cost.

Mercantile opinion of the Board at 18; Commerce opinion of the Board at 14 (footnote omitted).

that the Board deny its application. Mercantile clarified its position before the Board, which considered that Mercantile had agreed to abide by the Board's decision that the banks were fiduciaries for their insurance customers.

---

**3.** No evidence was presented which would indicate that the conflicts problem was exacerbated when the agent and loan officer was the same person.

**4.** The ALJ did not believe that Mercantile properly recognized this duty, and recommended

We interpret this commitment to sell at the lowest practicable cost to mean that (1) the holding companies will consult with a number of reputable and sound underwriters, (2) premium cost will be a primary factor upon which the holding companies will rely in choosing an underwriter, and (3) the banks will sell at prices no higher than, and preferably lower than, the prevailing rate offered in the same area.[5]

There is nothing wrong with the bank holding companies making a reasonable profit from their insurance business. However, there is everything wrong with taking advantage of the bank's role as lender to overcharge customers on insurance. In many ways the banks will be in a favored position to obtain their customers' insurance business. It will be easier, more convenient, and quicker for some customers to buy insurance at the same time and place they receive their loans. This advantage to the customer would be obliterated, however, if the bank charged unnecessarily high premiums.

■ We consider that the commitments imposed by the Board as interpreted in this opinion sufficiently protect the public from the possibility that the holding companies will overcharge. Given these commitments, cost weighs neither for nor against the banks' entry into the insurance business.

The Board found significant public benefits from the entry of Mercantile and Commerce into the insurance business. Those benefits are greater convenience and increased competition by service. The Board found that the public was protected against possible adverse effects of tying, conflicts in interest, and high prices by the holding companies' numerous commitments. We cannot disagree with these findings, and therefore affirm the Board's conclusion that benefits outweigh adverse effects.

### c. Legality under Missouri law.

■ IIAA argues that the Board's orders contravene Missouri law. It is well-established that the Board must consider whether it would violate state law for the bank holding company to sell insurance in the manner outlined in its application. *Florida Agents*, 591 F.2d at 341–43. However, it is also established that reviewing courts must give the Board "the power to make reasonable assumptions with respect to whether section 4(c)(8) applications will comply with state law." *Id.* at 342 (footnote omitted).

■ We need not go into the specifics of the Missouri law question. It is sufficient to note that the Board's decision is not undermined by contrary case law, and that it is consistent with the views of the Missouri Finance Commissioner. We find no error in the Board's decision to rely on the opinion of the Missouri official charged with administering the state statutes at issue.

### d. Federal law.

IIAA argues that the National Bank Act prohibits national banks in towns with a population over 5,000 from acting as insurance agents. A large number of the banks owned by Commerce and Mercantile are national banks in towns of over 5,000 population. IIAA relies on 12 U.S.C. § 92, which authorizes national banks operated in towns of under 5,000 population to act as agent for insurance sales. IIAA argues that since the statute only authorizes sales in towns under 5,000 population, sales in towns larger than that are implicitly prohibited.

In *Saxon v. Georgia Ass'n of Independent Ins. Agents*, 399 F.2d 1010 (5th Cir.

---

**5.** This interpretation is not inconsistent with the bank holding companies' understanding of what lowest practicable cost means. Mr. James Brown, president of Mercantile, testified that "I'm not going to say we'll match the lowest, nor will we be at the highest; but we will strive always to get that coverage from the carrier so we can meet that competitive price on a reason-able basis." D.R. at 1503. Mr. James Linn, an executive vice president at Commerce, testified that "we would try to be reasonable and competitive in the market," D.R. at 1790, and that Commerce would shop underwriters for competitive rates, and, if possible, lower commissions. D.R. at 1798.

1968), the Fifth Circuit struck down a ruling by the Comptroller of the Currency that "[n]ational [b]anks have the authority to act as agent in the issuance of insurance which is incident to banking transactions." *Id.* at 1012. The court applied the *expressio unius est exclusio alterius* rule to interpret § 92, and held that that rule "requires the construction that national banks have no power to act as insurance agents in cities *over* 5,000 population." *Id.* at 1013 (emphasis in original).

 *Saxon* provided the ALJ and the Board with considerable difficulty in this case. They noted that it would be difficult to distinguish *Saxon,* and were unwilling to refuse to follow *Saxon* without support in the case law. However, the ALJ considered that *Saxon* could be avoided by requiring separation of the operations of the national bank and the insurance business. The ALJ noted first that the holding companies had formed separate subsidiaries for their insurance business. The ALJ directed that the bank employees who would be selling insurance should enter into employment contracts with the holding company's insurance agency subsidiary. The contract would provide that the insurance agents-bank employees would be paid in part by the insurance agency, and that the agency was in charge of the employees' insurance selling activities. If this scheme were followed, the ALJ reasoned, no "national bank" would be acting as agent for insurance sales, and § 92, if applicable, could be avoided. The Board agreed that "such a condition would give the holding company sufficient control over the conduct of the selling of insurance that the activity would not be viewed as an activity of the bank." Commerce opinion of the Board at 9; Mercantile opinion of the Board at 12.

We agree with the Board that the conditions imposed by the ALJ remove this case from whatever strictures § 92, as interpreted by *Saxon,* impose.[6] The insurance agency subsidiaries are separately incorporated. Both bank holding companies indicated that their insurance agency subsidiaries would have at least one full-time employee who will work solely on insurance matters. The conditions imposed by the Board assure that the sale of insurance will be controlled by the insurance subsidiary, not the individual banks.[7] In a different but analagous situation we held that we will fail to recognize the separate corporate forms of bank holding company subsidiaries only when there is "fraud or complete subterfuge." *Grandview Bank & Trust v. Board of Governors,* 550 F.2d 415, 420 (8th Cir.), *cert. denied,* 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977). Given that the conditions assure the insurance business will not be controlled by the individual banks and that the Board can enforce the conditions, we agree with the Board's conclusion that § 92 will not be violated.

## IV. CONCLUSION.

The orders of the Board are affirmed.

ROSS, Circuit Judge, dissenting.

I respectfully dissent. The majority concludes, initially, that Mercantile's application was sufficiently precise to comply with this court's order in *Independent Insurance Agents of America, Inc. v. Board of Governors of the Federal Reserve,* 658 F.2d 571 (8th Cir.1981) (hereinafter *Mercantile I*). I am unable to join in that conclusion because in my opinion the proposal remains vague in areas of critical importance to the public. These areas of concern are "tying" and the cost of the insurance to be offered for sale.

**6.** There is a strong argument that *Saxon* was wrongly decided. The legislative history indicates that Congress was concerned only with providing small-town banks with an additional profit source, not with prohibiting city banks from selling insurance. Despite our doubts about *Saxon's* validity, we prefer not to disagree openly with a sister circuit, and find it unnecessary to do so.

**7.** Once again, the Board has the power to enforce this condition and may take action against the bank holding company if it appears the individual banks are directing insurance activities.

The ALJ found that no clear commitment on the price of the insurance was made in Mercantile's proposal. In fact the evidence indicated that Mercantile itself did not know whether its product would fall in the high, middle or low cost area. This failure to specifically commit to at least a general price level led the ALJ to recommend, albeit hesitatingly, that the application be denied. This court has already stated its opinion on the importance the cost of insurance plays in these applications.

> [7] The Board recognized that Mercantile is under a fiduciary obligation to make insurance available at the lowest practicable cost to the consumer. Board's Brief at 30 (citing 36 Fed.Reg. 15,525 (1971)). In considering this fiduciary obligation on remand, we find it unnecessary for the Board to elicit specific insurance rate quotations from Mercantile. The Board must, however, consider general proposed insurance rates before it can determine the validity of the IIAA's claims that MBI's rates will be much higher than those offered by independent agents in the relevant markets. *Quite simply, we consider potential cost to consumers an essential factor in the Board's net public benefits determination under 12 U.S.C. § 1843(c)(8).*

*Mercantile I, supra,* at 576 n. 7 (emphasis added).

The murky nature of Mercantile's proposal in the area of cost is especially worrisome when considered in conjunction with the record on the question of tying. The majority recognizes that both Mercantile and Commerce are linked to tying in the past and that both have enjoyed an unusually high success rate (penetration) in the sale of credit life insurance to borrowers. We are confronted then with the specter of an extremely successful "sales program" peddling overpriced coverage to a captive market. The "stringent commitments" entered into by the applicants and subject to enforcement by the Board are not enough. Enforcement of the law against coercive tying will be very difficult. Furthermore, the evils flowing from voluntary tying alone are sufficiently great, so that the application must be quite precise on the question of cost if the public is to be protected.

It follows from the above that I am also unable to accept the majority's conclusion on the question of public benefits. In addition to my reservations on the issues of tying and price, I am persuaded that any potential benefit accruing to the public because of convenience is outweighed by the evils which will flow from conflicts of interest: (1) Both of the applicants' proposals state that the insurance agent will also at times act as a loan officer. The majority, in addressing this conflict, points out that the applicants have promised that no insurance will be offered until after the loan is approved. This promise appears to be inconsistent with another of the applicants' proposals which would permit premiums to be financed, and ignores the consumer's potential desire for a subsequent loan. (2) The agent/loan officer will be unable to offer low cost multi-car insurance to the borrower who has only one of the family autos pledged to the bank. The sale of insurance covering unencumbered property or property not collateral for loans made by the applicant bank cannot logically be said to be "related" to banking. *Alabama Ass'n of Ins. Agents v. Board of Governors of the Federal Reserve System,* 533 F.2d 224, 241–44 (5th Cir.1976). And as the Board has previously argued to this court, the *Alabama Ass'n* case has foreclosed any reinterpretation of the regulation. *Mercantile I, supra,* at 575 n. 4. This potential conflict is also applicable to comprehensive home and auto insurance. (3) The bank's interest will be best served if each borrower purchases low deduction but high premium insurance which completely covers the bank's security. The borrower's interest may of course require a choice of the lower cost insurance.

In light of these conflicts, I believe it is unrealistic to expect the agent/loan officer to ignore the interests of the institution which pays his salary and still fulfill his fiduciary obligations. In short, I am of the opinion that the only public which will be benefited under the majority's decision is that part of the public which owns stock in either Commerce or Mercantile.

I must also dissent from the majority's determination that *Saxon v. Georgia Ass'n of Independent Ins. Agents,* 399 F.2d 1010 (5th Cir.1968) is inapplicable to the facts of this case. The court in *Saxon* clearly held that 12 U.S.C. § 92 (1976) prohibits a national bank located in a town with a population of over 5,000 from selling insurance. The majority distinguishes this case by accepting as meaningful the separate corporate identity of the insurance sellers. This is unrealistic. The same employees, working in the same building, will sell insurance to the same customers that apply to the banks for credit. In addition, the profits from these sales will flow into the same pockets. The applicant banks will be selling insurance and to conclude otherwise would ignore the realities of the situation. If *Saxon* was correctly decided then it should not be so easily circumvented. If, on the other hand, this panel concludes that the decision is incorrect we should decline to follow the precedent of a sister circuit. In no event should we permit artifice to evade the effect of precedent. I accordingly dissent.